BOWES v. HOPKINS et al.

(Circuit Court of Appeals, Seventh Circuit. February 5, 1898.)

No. 447.

NEGLIGENCE—RAILROAD COMPANY—LIABILITY TO EMPLOYE.

In the case of an accident to an employé on a switching train moving at night through a city street, mere evidence that it was caused by running into a horse which had attempted to cross a culvert, supporting the tracks, and constructed in the customary manner, with ties set some distance apart so as to deter stray animals from venturing on it, and had there become fastened or caught between the ties, is insufficient to establish negligence on the part of the railroad company.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

In the court below an intervening petition was filed by the administrator of James Donahue in a foreclosure suit brought against the Chicago & Northern Pacific Railroad Company, to recover for the death of the deceased, who was killed in an accident at Forty-Fourth street, in the city of Chicago, on April 1, 1894. The case was heard before the court, which decided against the right of the petitioner to recover, and entered a decretal order dismissing the petition for want of equity. This appeal is from that order. Donahue was in the employ of the Wisconsin Central Company, which was operating the railroad of the Chicago & Northern Pacific Railroad Company as lessee.

This suit is brought against the receiver of the lessor, instead of the company which was at the time operating the road. At Forty-Fourth street, the place of the accident, there are two main railroad tracks running east and west, and at right angles with the street. Donahue was a member of a switching crew, consisting of an engineer, Stofft, a fireman, Crebum, and two other switchmen, Wincher and Andrews, the latter being foreman of the crew. The train on which the accident happened started from Forty-Eighth street, four blocks west of Forty-Fourth street, towards the east, on the south main track, and was to run with two car loads of sand ahead of the engine to Kedzie avenue, a distance of about two miles. The engineer was at his place in the engine cab, on the right or south side of the engine. The fireman was on his seat on the left or north side. Andrews and Donahue were on the forward end of the more easterly car, keeping a lookout. Behind the engineer on a seat was an extra switchman, one Stearns, who was not a member of the crew. The engine had a headlight, properly lit, at each end. Thus equipped, the train left Forty-Eighth street, at about 7:15 o'clock in the evening, towards its destination, two miles east. After slowing up for a railroad crossing two blocks to the east, it proceeded on its way until it reached Forty-Fourth street, when it struck a horse on the track, and was derailed and wrecked, both Donahue and Andrews being killed. When the cars struck the obstruction at the crossing, Crebum called out "Whoa" to the engineer, who applied the brake and reversed the engine, and stopped as quickly as he could. This train, with others, was under the charge of H. A. Meyers, who was yard master at Forty-Eighth street. It was part of his duty to give instructions generally as to where the crews and trains should go, his duty in regard to this train being the same as to the others under his charge as yard master. His instructions given to Foreman Andrews were to take two cars of sand to Kedzie avenue from Forty-Eighth street. When Andrews got the cars ready to go he remarked to Meyers that there was a dummy or suburban train due, and Meyers told him to go ahead, that he could run as fast as they could, and that he was in a hurry to get the sand to Kedzie avenue. Andrews then said, "All right," and went ahead. These instructions to Andrews were not communicated to the engineer, who, so far as appears, had no knowledge of them, and received himself no other directions except the ordinary signal of raising or lowering the lantern to show that he was to go ahead. There was a culvert on the west side of the street crossing at Forty-Fourth street, in which the appellant alleges the horse was fastened at the time he was struck by the train. This was a bridge about six or eight feet long and two feet above the ground, under which there was a water way. It had been there for several years, and was intended partly as a bridge, and partly as a cattle guard, to prevent animals from straying from the street along the track and right of way. There was no fence connecting on either side with the culvert, which was constructed with stone butments for the timbers to rest upon. It was simply a bridge over a water way. It was constructed, however, with a view to keep cattle from crossing. The evidence shows that one purpose in the construction of such culverts is to make them so that cattle will be deterred from trying to cross them; that they will look in, and, seeing that they cannot cross safely, draw back, and not become fastened in them. To that end the timbers, which in this case were common ties, were laid crosswise of the track about 8 or 10 inches apart, and upon stringers at each side running the other way; that is to say, lengthwise of the track. The rails were laid upon these ties as upon other parts of the road. The evidence shows that this was then the usual way of constructing culverts on the roads in and about Chicago, to place ties 8 or 10 inches apart. The evidence is not clear as to the time the sand cars left Forty-Eighth street. No one took note of the time, and the witnesses differ in the testimony, or rather in their opinions. There was a dummy due at that station at 7:26, going east on the same track, and, as near as can be determined, the train which was wrecked started at about 7:15 p. m., 11 minutes ahead of the dummy's time. The speed of the switch train was about 12 miles an hour, as appears by the weight of testimony. Passenger trains on the same track went at the rate of from 25 to 35 miles per hour. All trains going east, whether freight or passenger, went over this track. All going west passed over the other track. The tracks

were properly fenced, and there is no evidence that cattle or horses had been encountered at this place before. Meyers, the yard master, had full authority to determine the order in which trains should run, both freight and passenger, and to delay suburban trains when necessary. Between Forty-Eighth street and Kedzie avenue there were several switches where the switch train could have side-tracked, if pressed for time. When the dummy due at 7:26 arrived, Meyers boarded the engine, and rode with the engineer until they met Stofft, the engineer on the switch train, coming back with his engine after the accident.

James C. McShane, for appellant.

Kemper K. Knapp, for appellees.

Before WOODS and SHOWALTER, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge, after stating the facts as above, delivered the opinion of the court.

There are two principal contentions made by the appellant: First, that the train was run at an unusually high and dangerous rate of speed, which was the proximate cause of the accident, and that Meyers, the yard master, in directing the switch train to start ahead of the dummy soon to be due, acted as a vice principal of the defendant, and was guilty of negligence in causing so high a rate of speed; second, that the horse, which was the occasion of the wreck, was fastened in the culvert at the time of being struck, and that the culvert or cattle guard was constructed in a faulty and insufficient manner, by having the ties so far apart that animals straying upon the track could step through and become fastened in the culvert, which was also the proximate cause of the accident.

There is also one contention made by the appellee and argued at length, which we do not find it necessary to decide, which is that the defendant receiver, being simply the lessor of the company actually in charge of and operating the road, is not liable. The circuit court, among other things, held that Meyers, the yard master, was not a vice principal, but a fellow servant with the deceased, citing the following cases: Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914; Railroad Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983; Railroad Co. v. Keegan, 160 U. S. 259, 16 Sup. Ct. 269; Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843; Railroad Co. v. Charless, 162 U. S. 359, 16 Sup. Ct. 848; Oakes v. Mase, 165 U. S. 363, 17 Sup. Ct. 345; Railroad Co. v. Brown, 34 U. S. App. 759, 20 C. C. A. 147, and 73 Fed. 970.

From the view we have taken of the evidence, we do not find it necessary to determine this question, as the evidence fails to show that there was any unusual rate of speed, or that, whatever the rate of speed was, it was the result of Meyers' directions. The engineer and fireman were the persons in best position to judge in regard to the speed of the train. They testify that it was running 10 or 12 miles an hour. Stearns, the extra switchman, says he judges they were running from 12 to 15 miles an hour. Wincher, the other switchman, who was called for the appellant, testified that he thinks the speed was 18 to 20 miles an hour. But the value of his testimony is somewhat lessened by the fact that immediately after the

accident he made several written statements in regard to the accident, in which he stated that the train at the time of the accident was running 10 to 15 miles an hour. Several witnesses were called by appellant who gave their opinions, against the objections of the appellee, that, from viewing the wreck after the accident, they thought the train was running at a much higher rate of speed. If the competency of such testimony should be conceded, the weight to be given to it would be very small. It would be difficult to judge, because the cars were derailed, and turned upon one side, and had plowed along the ground for a distance, whether they were going at the rate of 10 or 20 miles an hour. What Meyers said was said to Andrews without the engineer's knowledge. It was not communicated to him, and there is nothing to show that the engineer had not full control of the speed of the train. He testifies that no one at any time gave him any directions as to how fast he should run the engine. Several witnesses for the appellant testified, against the objections of appellee, that the rules for running trains required that trains running the same way on the same track should keep not less than 10 minutes apart. But when the rules were produced the time turned out to be 5 minutes instead of 10. But this rule was made to prevent collision between trains running in the same direction on the same track, and had no reference to the prevention of collisions with obstructions of the character in question. The switch train had but 2 miles to go. It had somewhere from 11 to 15 minutes the start of the dummy, which was to follow. It had plenty of time to make Kedzie avenue without any danger of collision with the dummy, as that was not due there until 7:33, giving the switch train about 18 minutes in which to make the 2 miles. And, as an extra precaution, the yard master, who knew well the situation, went with the engineer on the suburban train. There is no evidence to show that the speed of the train had anything to do with causing the accident. It is easy to conjecture that, if it had run either at a higher or lower rate of speed, it might not have encountered the horse at all, or, if it had, that the train would not have been thrown from the track. But it is quite impossible to determine what would have happened in either of these cases. Whether running 12 miles an hour would be more dangerous than running 8 miles an hour does not appear from the testimony. From all of the testimony it appears incontestably that the approximate cause of the accident was the wholly unexpected straying of a horse upon the railroad track in a populous city, contrary to a public ordinance. This is so obviously the case that it seems idle to strain one's vision to find some other co-operating cause which will serve to point the way to a case for damages. Under the present construction and management of railways, obstructions arising from the straying of horses and cattle upon the right of way are not wholly to be prevented. In this case we do not deem it at all material whether the horse was caught in the culvert at the time the train collided with him or not. The culvert was made in the usual manner, the purpose being to deter horses and cattle from attempting to pass over. If they attempt to pass over when the ties are 8 to 10 inches apart, they are very likely to step through

and become fastened, which the evidence shows makes a more dangerous obstruction than as though they were strayed upon the track and not fastened. On the contrary, if the culvert is planked over so as to prevent their stepping through, it makes a bridge over which all cattle and horses may safely pass from a crossing and stray upon the track, which, upon the whole, would be a still greater menace to the safe operation of the road. It is equally for the interest of railroad companies and the public that dangers from such a source should be reduced to a minimum, and that, no doubt, has been the aim of those intrusted with the management of railroads. It is one of those dangers which is not wholly avoidable so long as grade crossings are in use, giving rise to one of those hazards which an employé assumes when he engages in the business. The deceased had been employed upon this road for some time. There were many culverts of the same kind at different crossings along the track, of which he must have known. The danger from such an obstruction as this was as well known to him as to those in charge of the road. It was one of the ordinary risks which he assumed when he entered into the service of appellee as switchman.

It has already been said that it makes but little difference whether the horse was in the culvert when struck or not. But the evidence shows clearly that he was not. Several witnesses for the appellant testify that they saw after the accident blood and hair extending from the culvert along the track to the planking in the middle of the street. This, if there was no other evidence, would not show that the horse was fastened in the culvert. It would only show that he was struck near the culvert,—it might be on one side and it might be on the other,—and carried along the track to the east. But the appellee's evidence, which is wholly uncontradicted, shows also that there was blood and hair found along the track at some distance west of the culvert. M. McKernan, who was train master of the Chicago & Calumet Terminal, testified that he discovered a clot of blood, and some horse hair and perhaps a little flesh, west of the culvert, possibly 60 feet. John Conlon, a track foreman, testified that he found blood and other evidences of the horse about 35 feet west of the west end of the culvert, though he says on cross-examination that he might be mistaken about it. He is corroborated by his son, William J. Conlon, who testifies that he went to the wreck right after the accident, and that the most westerly point where he discovered any evidence of the horse was about one rail's length west of the culvert, where he found hair and blood. This evidence is not at all in conflict with that produced by the appellant on this question, and the whole together shows that the horse must have been struck some 30 to 60 feet west of the culvert, and carried over the culvert and across the street to the east. Whether he had crossed this culvert or had come on from the street west there is nothing to show. Upon the whole case we are unable to find any negligence on the part of those in the management of the road which caused or contributed to produce the injury to the deceased, and the order of the circuit court is affirmed.