CLEVELAND, C., C. & ST. L. RY. CO. v. BROWN.

(Circuit Court of Appeals, Seventh Circuit. May 4, 1896.)

No. 72.

1. MASTER AND SERVANT—FELLOW SERVANTS—PERSONAL INJURIES.
A foreman of a railroad bridge gang, who is a subordinate of the superintendent of bridges, but has authority to hire and discharge the men under him, and sole power to direct and control them in their work, is their fellow servant, with respect to injuries caused to one of them by his negligence in adopting and pursuing a dangerous method of doing a given piece of work, such as throwing down a railway transfer shed, and the company is not liable therefor. 6 C. C. A. 142, 56 Fed. 804, reversed. Railroad Co. v. Keegan, 16 Sup. Ct. 269, 160 U. S. 259; Railroad Co. v. Peterson, 16 Sup. Ct. 843; Railroad Co. v. Charless, Id. 848,—applied.

2. SAME—UNSAFE TOOLS—MANNER OF USE.
If necessary and safe tools and appliances are furnished by a railroad company for the use of a foreman and a gang of laborers under his control, in doing a given piece of work, but they are not employed, or are unskillfully employed, through the negligence or want of skill of the foreman, the company is not liable for a resulting injury to one of the laborers; but if the tools and appliances used are insufficient, and are employed because better were not furnished, the company is liable. Railroad Co. v. Keegan, 16 Sup. Ct. 269, 160 U. S. 259; Railroad Co. v. Peterson, 16 Sup. Ct. 843; Railroad Co. v. Charless, Id. 848,—applied.

Error to the Circuit Court of the United States for the Southern District of Illinois.

This is an action for personal injuries suffered by the defendant in error while in the service of the plaintiff in error as one of a crew of men called the "bridge gang," and employed generally in building and repairing bridges, depots, platforms, and other structures, and, at the time of the injury complained of, engaged in taking down a transfer shed near Cairo, Ill. Upon the first hearing of the case the judgment below was affirmed. 18 U. S. App. 10, 6 C. C. A. 142, 56 Fed. 804. But in view of the opinion of the supreme court in the case of Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, decided soon afterwards, a rehearing was granted. The reargument was had at our May session, 1894, Justice Harlan presiding, and on June 9, 1894, a certificate was made of questions upon which the instruction of the supreme court was desired. The certificate contained a copy of the declaration, and

a statement of facts, which is given below. The declaration contains three counts, which, after alleging, among other things, that Patrick C. Scullen was foreman of the bridge gang of which the plaintiff was a member, and had full authority and control over the men, with power to hire and discharge them, and therefore stood to them as the representative of the defendant, makes the following charges of negligence: In the first count, that "said Scullen, as such foreman aforesaid, by his gross negligence in managing and directing the fellow servants of plaintiff in the performance of the work aforesaid, caused a portion of the roof of that part of said building so being torn down as aforesaid to be thrown with great force and violence against and upon plaintiff." In the second count, in substance, that the defendant did not furnish or use, or cause to be used, the necessary tools, implements, or appliances for the safe tearing down of the portion of the building or structure which was to be taken down, but, on the contrary, negligently failed and refused to furnish and use the same; that Scullen, as such foreman, negligently ordered and directed that a certain prop or brace, made of a certain piece of timber, be placed to and against the portion of the structure to be torn down, for the purpose of pushing the same over as soon as a certain post, constituting the principal support of that portion of the structure to be torn down, should be sufficiently cut near its lower end as, in the judgment of the said Scullen, to allow the said portion of the structure to be pushed over or thrown down by the use of the prop aforesaid; that the prop was carelessly placed against the building, and Scullen ordered plaintiff to cut the post until the same should be sufficiently weakened to enable said portion of the building to be pushed over, and in consequence of the neglect of the defendant to furnish and use such necessary and proper tools, implements, and appliances, and in consequence of the carelessness and negligence of the said Scullen, as such foreman, in so ordering said plaintiff to chop and weaken the post aforesaid, and while plaintiff was then and there cutting and weakening the post, the roof of said portion of the building was then and there thrown down upon plaintiff. In the third count, in substance, that Scullen, as such foreman, did not carry on the work in such manner as not to expose plaintiff to unnecessary danger, but negligently and carelessly directed and commanded the plaintiff to go under the said building, the roof of which had not been previously removed, and to cut near the lower end thereof, and thereby to weaken a certain post under the building, then and there constituting the principal support, so that the said building could be pushed over by the use of a certain prop or brace, which he negligently caused to be placed against the building for that purpose; and in consequence of the negligent and careless way and manner of Scullen in carrying on the work, and commanding plaintiff to cut and weaken said post, a part of the roof of the building was thrown upon him, and he was injured.

The statement of facts, in substance, and the questions certified, were as follows:

On the 18th of November, 1889, at Cairo, Ill., Millard F. Brown, the defendant in error, and six or seven other persons, all in the service of the plaintiff in error, were engaged in taking down a part of a large frame structure or shed, sometimes called a "railroad transfer shed," located in the upper part of the city. The shed was about 120 feet long, and stood between two railroad side tracks; the platform part of the same being about 12 feet wide and 3 feet high. The oak planks constituting the floor of the platform, on which goods were transferred from cars on one side to cars on the other side of the shed, were 2 inches thick, laid on heavy timbers, which were themselves supported by and fastened to heavy square posts set in the ground. The shed was not inclosed at sides or ends, but had a tar and gravel roof, about 11 feet above, of the length and width of the platform or floor, and supported by and on a row of 8x10-inch oak posts, 15 feet apart, extending along the center line of the platform. Along and on top of these posts, pine plates or timbers, 4x6 inches in size, extended, constituting the center plate; and near the tops of the posts, and to them, were fastened caps or cross-arm pieces, 12 feet long, and on the ends of these were laid and fastened smaller plates, and on the center and side plates rafters were laid and fastened, 2 feet apart; and on this framework rested the roof, made of ⅞-inch cypress planks, paper,

and a light coating of gravel. The men were in charge of a foreman named Patrick Scullen, and they had, for a week or two prior to November 18th, been constructing a similar, but longer and heavier, shed, in the lower part of the town, for like transfer purposes; and, on the afternoon of the 18th, Scullen took his men from that shed to the one uptown, to obtain out of the latter a quantity of light planks, or strips of planks, to send up the road to be used to stay and tie together temporarily trestle or bridge work or frame bents, when being put in place. Scullen, who was employed under the general authority of one Hanson, superintendent of bridges on the Cairo division of appellant's road, extending from Cairo to Danville, Ill., and to Vincennes, Ind., had authority, when necessary, to employ, and to discharge at pleasure, the men of his gang. He had sole control of the men when at work, the superintendent directing only what work should be done; Scullen determining, in this instance at least, the method and means by which it should be done. His plan was to take down at once the four north panels, or 60 feet of the shed; and he directed Brown and Charles Mahon to go upon the roof and saw the same in two transversely. Other men were set to work chopping the four center posts on their west sides, about 2 or 2½ feet above the floor or platform; and, desiring to throw the shed over to the west, he put two braces or shores against the shed,—one at the north end, and the other at or near the fourth center post, and about 15 feet north of the place where the roof was severed. These shores were oak timbers, one 3x10 and one 2x12, and were braced against the west rail of the east railroad track, and against the roof of the shed. With these braces or shores he expected to push over the four panels of the shed, by breaking off the four posts at the places where they were chopped. After the roof had been sawed, and the posts all chopped about half off, or through, on their west sides, Scullen had his men take hold of the braces and make an effort to push the shed over to the west, expecting the posts to break at the chopped places. A strong, high wind from the west was blowing, making the work at once more difficult and dangerous; and, finding that they could not push the shed over, the posts not being sufficiently weakened, Scullen directed Mahon to take an ax and chop a little on the east side of the post between the fourth and fifth panels. The roof had been sawed off just north of, and close to, the fifth post; and the fourth post was therefore supporting all of the roof between the fourth and fifth posts, as well as its share of the roof between the third and fourth posts. Mahon, in reply to Scullen, said he was not a good hand with an ax; and thereupon, as Mahon testifies, Scullen said to Brown, "You chop it, Brown, on this side, a little, and probably we can throw her over." Brown, who, according to his own testimony, had just come down from the roof, and did not know to what extent the posts and braces under the roof had been cut, took the ax, and begun chopping the post on the east side, as directed, and, while he was chopping, the lower end of the post, being either chopped off, or twisted off by force of the wind upon the shed, dropped down upon and through the platform, breaking the planks; and that part of the roof, which had been supported by the post, came down upon Brown, and injured him.

(1) "Assuming that Brown's injury was caused by the negligence of Scullen in one or more of the particulars charged by the declaration, and within the statement of facts, was Scullen the fellow servant of Brown, in such sense as to exempt the plaintiff in error from liability?" (2) "Assuming that the method adopted by Scullen for taking down the shed was dangerous, that the tools and appliances provided for accomplishing the work were insufficient or defective, and that the injury suffered by Brown was caused by the employment of that method, or of insufficient appliances, or both, is the plaintiff in error responsible for the injury, notwithstanding the fact, if it be a fact, that Brown and Scullen were fellow servants?" (3) "If the place where Brown received injury was not a safe place in which to work, but by the use of the proper appliances, which were not used, and were not furnished for such use by the plaintiff in error, could have been made safe, is the plaintiff in error liable, or may it be liable, for the injury as one caused by its failure to furnish Brown a safe place in which to work?" (4) "When a master employs a number of servants to work together and in concert, under circumstances which require supervision in order reasonably to guard the

men against danger, the work being such that the safety of one is dependent upon the acts, conduct, or movements of others beyond his observation or control, is it, or not, a duty of the master to furnish the requisite supervision; and if, in a given case, that supervision is committed to the foreman of a gang or band of men employed upon a work of the character stated, will the master be liable, or not, for an injury to one of the men caused by negligent or unskillful supervision?"

The supreme court on January 20, 1896, made the following order: "It is ordered by the court that the submission of this cause be, and the same is hereby, set aside, and the cause remanded to the United States circuit court of appeals for the Seventh circuit, with leave to file a more explicit certificate, or otherwise to proceed in the cause according to law."

John M. Lansden, for plaintiff in error.

Samuel P. Wheeler and W. N. Butler, for defendant in error.

Before WOODS and JENKINS, Circuit Judges.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

The questions certified to the supreme court—though perhaps not identical, unless it be the first, with questions presented by the record—were deemed to be closely pertinent; and the aim was to obtain, in answer to the fourth, a declaration of principle, and in answer to the others, if the principle suggested were affirmed, guidance for its application. The particulars in which the questions were found to be inexplicit not having been pointed out, we are unable to put them in a form better calculated to elicit the information which we sought. Indeed, the necessity for so doing has been removed in large measure by later decisions. We refer especially to Railroad Co. v. Keegan, 160 U. S. 259, 16 Sup. Ct. 269; Railroad Co. v. Peterson, 16 Sup. Ct. 843; and Railroad Co. v. Charless, Id. 848. These cases, together with the opinion in the Baugh Case, have put it beyond question that the circuit court erred in this case when, in substance, it instructed the jury, and refused a contrary charge asked by the plaintiff in error, that if Scullen was a foreman, with authority to employ and discharge men, and to oversee and direct them in the performance of the duties assigned them, and, with that authority, had employed Brown and others, and had assigned them to the work of throwing down the company's transfer shed, he was not, in respect to that work, a fellow servant, but stood to the men in the relation of a vice principal or representative of the company. Scullen was not in charge of a department, but, on the contrary, was subordinate to another, who had the general charge of the construction and repair of bridges and other structures, on a division of the road; and the company is therefore not responsible for injuries suffered by any of his subordinates by reason of his misconduct, unless it was a neglect of some duty which the master owed, as master, to the one injured. For the neglects of a foreman, as such, the master is not responsible. It was laid down in the Baugh Case, and reaffirmed in Railroad Co. v. Keegan, supra, "that the rightful test to determine whether the negligence complained of was an ordinary risk of the employment was whether the negligent act constituted a breach of positive duty owing by the master, such as that of taking

fair and reasonable precautions to surround his employés with fit and careful co-workers, and the furnishing to such employés of a reasonably safe place to work, and reasonably safe tools or machinery with which to do the work,—thus making the question of liability of an employer for an injury to his employé turn rather on the character of the alleged negligent act, than on the relations of the employés to each other, so that, if the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is the negligence of the master; but, if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is liable therefor." By this test, once it is conceded—as, under these decisions, it must be—that Scullen and Brown were fellow servants, it is clear that for the acts of negligence alleged in the first and third counts of the declaration the company was not responsible. Those acts were all in the line of a foreman's duty, the risk of which the employé assumed when he entered upon the service.

The second count is subject to the same criticism, except in so far as it alleges a failure and refusal of the company to furnish the necessary tools, implements, or appliances for the safe tearing down of the shed. What tools or appliances were needed, which were not furnished, it is not averred; but it was for the defendant to move that the declaration be made more specific in that respect, if desired, and, that not having been done, proof was admissible under the general averment. If the necessary tools were furnished by the company, but they were not employed in the work, or were unskillfully employed, through the negligence or want of skill of the foreman, the company, for the reason already explained, is not answerable for the result; but if the tools and appliances used were insufficient, and were employed because better were not available, and that was the cause of the injury, the company is liable. There is a duty on the part of a master to provide his servants a safe place in which to work, but manifestly that principle is not applicable to a case like this, where the place becomes dangerous in the progress of the work, either necessarily, or from the manner in which the work is done. The judgment below is reversed, and the cause remanded, with instruction to grant a new trial, and to permit, if desired, an amendment of the declaration.