KING et al. v. MORGAN.

(Circuit Court of Appeals, Eighth Circuit. May 3, 1901.)

No. 1,418.

1. MASTER AND SERVANT—DANGEROUS IMPLEMENTS—ASSUMED RISK.

An intelligent man, with full knowledge of the character and quality of an implement furnished him for use, and all of the facts and physical laws which render its use dangerous, after having voluntarily accepted employment in a hazardous business, involving the use of such implements, cannot be heard to say that he did not know it was dangerous, but assumes the risk of injury from its use, as a hazard of the employment.

2. SAME.

Plaintiff, who was employed in defendant's mine, and engaged in blasting rock by the use of a machine drill and dynamite, was injured by the premature explosion of a charge which he was tamping into a hole drilled for the purpose. The tamping bar furnished by defendants and used by him consisted of a piece of iron gas pipe, with the end plugged with wood or clay. Such tools were largely used in other mines, as were also bars made of wood, and some of solid iron. There was some evidence tending to show that the wooden bars were the least dangerous. Plaintiff was 24 years old, intelligent and well educated, and with a considerable experience in the work, having been employed in the same work in different mines for more than two years, and in defendant's mine for three months, during all of which time he had used the same kind of bar without objection and without accident. He knew the properties of dynamite, and that it would explode by concussion, and was as well qualified as defendants to determine whether the bars in use were more dangerous than others used in other mines. *Held*, that he assumed the risk incident to the use of the kind of bar furnished him.

3. SAME—DUTY OF MASTER TO INSTRUCT SERVANT.

No duty rests upon a master to instruct a servant as to the probable dangers of the employment, where he is mature, intelligent, and experienced in the work, and the master has no notice or reason to believe that he is not fully competent and acquainted with such dangers.

Caldwell, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Colorado.

This was an action instituted by Morgan, defendant in error, against King, Brewster, and Porter, doing business under the firm name of Cook Mining Company, plaintiffs in error, to recover damages for an injury sustained by him while working for them in one of their mines. Plaintiff charged that he was employed to tamp powder in drill holes, preparatory to exploding rock, and that defendant negligently furnished him with an unsafe and dangerous implement for doing the work, and that as a result of its use a premature explosion occurred, which seriously injured the plaintiff. The answer put in issue the alleged negligence, asserting that the defendants used reasonable care in selecting and furnishing the implement in question; that the business in which they were engaged was perilous, and that whatever danger or risk there was in using the implement in question was manifest and apparent to plaintiff; and that by accepting their employment he assumed any risk incident to it. A trial was had on these issues, and at the close of plaintiff's case, and again at the close of all the evidence, defendants requested the court to direct a verdict in their favor. The court declined to do so, and, after giving and refusing other instructions, the jury took the case and rendered a verdict for the plaintiff, upon which a judgment was entered below. There are many assignments of error, but the only one urged

at the hearing was that the court erred in not directing a verdict for the defendants.

William J. Miles, for plaintiffs in error.

R. D. Thompson (B. M. Malone, on the brief), for defendant in error.

Before CALDWELL and SANBORN, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge, after stating the case as above, delivered the opinion of the court.

We have read all the evidence preserved in the bill of exceptions with great care, and think the following facts are practically undisputed: Plaintiff at the time of his injury was a young man of 24 years of age, of mature judgment, and large experience in using the machine drill employed in mining operations. For more than two years he had been working in mines in Colorado, drilling holes and loading the same with dynamite (sometimes in the evidence called "giant powder") preparatory for explosions. For more than three months prior to his injury he had been employed in defendants' mines engaged in the same work. He was well educated, having had a full course of instruction in common schools, and instruction for about three years afterwards in high and normal schools. He knew the properties of dynamite,—among others, that it would explode by concussion. He knew the laws of force,—that a heavy blow was more likely to produce concussion than a light blow. He knew the necessity of graduating the force employed in tamping the charge into the drill hole so as, if possible, to obviate explosion. At the time he entered defendants' employment, he found their mine equipped with tamping bars made of gas pipe of the diameter of about one inch, interior measure, and of the length of about seven feet. The ends of these bars were plugged with wood, clay, or other substances, so that the dynamite could not be pressed back into their hollow interior. This sort of tamping bar had been for a long time in use by defendants at their mine, and at that time was in use in at least 25 per cent. of all mines in the state of Colorado. In a majority of the mines, however, wooden bars were employed for tamping purposes; in some, solid iron bars were employed, but these only to a limited extent; in others, an implement called an "iron scraper" was employed for the purpose of tamping in the charge of dynamite. Plaintiff at the time he entered defendants' employment was entirely familiar, by reason of previous service in other mines, with the use of each and all of these devices as tamping bars. He had seen them and used them himself in several other mines in which he had previously been employed. He had served an apprenticeship for several months, learning how to handle the machine drill, and, of necessity, how to drill holes and charge them with dynamite. After serving such apprenticeship he had been for a year or more before the injury in question in full charge of a machine drill, and knew as much about the merits and demerits of the different kinds of tamping bars employed in the mines as any one. At the time of engaging in the service of defendants he knew they were employing the hollow iron bar made of gas pipe, and commenced its use in defendants' mines

without complaint or any suggestion of change, and continued using it without complaint or criticism for over three months before he was injured. During these three months no accident or injury occurred to plaintiff or any of his co-employés. It appears from plaintiff's own evidence that these tamping bars were entirely fit for the purposes for which they were used, and did good execution in tamping. While there is much conflict of testimony on the subject, there is evidence in the record tending to show that wooden tamping bars are less dangerous than iron bars; but it also appears (of which fact we may take judicial cognizance) that the business of exploding rock in mining operations is, at best, a hazardous one. Plaintiff testified that he knew that a blow would cause an explosion of dynamite. He also testified, in answer to questions, as follows:

"Q. How hard did you tamp? That is, what force is usually applied for the tamping of this powder? * * * A. * * * Just steady, up and down. You get the powder in the bottom of the hole, and, after the powder has reached the bottom of the hole, pack it up and down something like that [indicating], with the bar in your hand. Never let loose of the bar. Let it go down like that [indicating]; not like the old-fashioned shotgun,—don't go down as hard,—but pack it. Q. Not like they used to load what? A. The old-fashioned shotgun; going down hard. Q. Why not? Why were you so particular? Why was it necessary to be so particular? On account of the liability of the dynamite to explode, if you struck hard, the powder? A. Yes, sir; I have heard of cases where dynamite was exploded by two trains coming together, as a jar would strike it; not necessary to strike it very hard."

Plaintiff says he was not informed by defendants at the time he entered their service that the bars in question were unsafe, and that he did not know they were unsafe. The trial below proceeded on the theory that there was some evidence tending to show plaintiff's ignorance of the danger incident to the use of the tamping bar in question, and the court's charge left this issue to the jury, as necessarily involved in the determination of their verdict. Notwithstanding plaintiff's claim of ignorance of danger, we are of opinion that the facts of the case, as already detailed, conclusively negative any such ignorance. He admits an intelligent appreciation of all the facts which constitute danger, and there was nothing in the implement complained of either occult or at all complicated or intricate. It was a simple piece of gaspipe, perfect of its kind, and one which, in his former employments, plaintiff had had full opportunity of contrasting with others, which he now says were safer. An intelligent man, with full knowledge of the character and quality of the implement furnished him for use, and of all the facts and physical laws which render its use dangerous, after having voluntarily accepted employment in a hazardous business involving the use of such implements, will not be heard to say he did not know it was dangerous. Tuttle v. Railroad Co., 122 U. S. 189, 195, 7 Sup. Ct. 1166, 30 L. Ed. 1114; Dredging Co. v. Walls, 28 C. C. A. 441, 84 Fed. 428; Lyons v. Lighterage Co., 163 Mass. 158, 39 N. E. 800; Donahue v. Manufacturing Co., 169 Mass. 574, 48 N. E. 842; Walsh v. Railroad Co., 27 Minn. 367, 8 N. W. 145; Hill v. Drug Co., 140 Mo. 433, 41 S. W. 909. The case is thus reduced to one where plaintiff entered a hazardous employment, and voluntarily and without any complaint

commenced work with an implement simple in character, with full knowledge of all facts concerning its use and of the dangers incident to such use, and also with full knowledge of the fact that other implements, which his evidence tends to show to be of a safer sort, were commonly used in other mines in that vicinity. The fact, disclosed by the proof, that defendants did not at the outset inform plaintiff of the danger incident to the use of the tamping bar in question is, under the circumstances of this case, no evidence of culpability on their part. The duty of cautioning a servant rests upon the master only in case he is informed or has reason to believe that the servant is inexperienced and ignorant of the probable dangers he is about to encounter. The master, in the absence of such information, may assume that an applicant who is apparently mature and intelligent is qualified for the particular work applied for by him. "It is only where such facts are brought to his notice of the disqualification of the servant to safely encounter dangers known to him, and presumptively unknown to the servant, that the duty of cautioning and instructing the servant arises." Railroad Co. v. Miller, 43 C. C. A. 436, 104 Fed. 124, and cases cited. Plaintiff's unusual intelligence and long experience in all the details of the work undertaken by him, as already narrated, fully exonerate defendants in this case from any such obligation. The general rule requiring an employer to furnish his employés with tools and appliances reasonably safe for the purposes for which they are intended, as laid down in the case of Railroad Co. v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188, to which our attention is invited by counsel for defendant in error, is fully recognized, and should be enforced in all proper cases. In this case, however, the uncontradicted testimony is that the tamping bar in question was perfect of its kind, and well adapted to the purposes for which it was intended, and did good execution in tamping. It also appears that in the year 1898, at the time plaintiff entered defendants' service, the operators of between 3,000 and 4,000 out of the 12,000 to 15,000 mines in operation and in process of development in the state of Colorado were using the kind of iron tamping bar in question. In the light of these and all the other facts disclosed by the record, even though there be evidence that a different kind of tamping bar was more commonly employed, and was safer for the men, it is difficult, in the light of the doctrine announced in Railroad Co. v. Blake, 27 U. S. App. 190, 11 C. C. A. 93, 63 Fed. 45, and cases there cited, to see how any actionable negligence can be charged against defendants for making use of the bar in question. It is unnecessary, however, to rest our conclusion on this ground, as all the facts already adverted to have a legitimate bearing upon the next question presented for our consideration; that is, whether plaintiff, under the circumstances of this case, assumed the risk of injury by the use of the tamping bar in question.

He offered himself to defendant as an experienced workman, ready, willing, and qualified to perform the hazardous service they required. He saw at the outset the character of the tamping bar with which they had equipped their mines, and well knew how it compared with other implements employed by other operators for the same purpose.

There was no concealment or other device resorted to by defendants to induce plaintiff to accept service involving its use. On the contrary, he entered upon such service without complaint, making no suggestion of any unfitness in the implement, or of any unusual exposure to be anticipated from its use. He affirmed and reaffirmed from day to day his satisfaction and willingness to use the implement in question, by continued use thereof without complaint. In the light of all the facts, we are of opinion that, notwithstanding that implement might not have been as safe as that which some other miners and operators employed for a like purpose, plaintiff must be held to have voluntarily assumed the risk incident to its use. The supreme court of the United States, in Railroad Co. v. McDade, 135 U. S. 554, 570, 10 Sup. Ct. 1044, 1049, 34 L. Ed. 235, 241, speaking of the obligations resting upon employers of labor, says:

"Nor are they bound to supply the best and safest or newest of those appliances for the purpose of securing the safety of those who are thus employed. They are, however, bound to use all reasonable care and prudence for the safety of those in their service, by providing them with machinery reasonably safe and suitable for the use of the latter. If the employer or master fails in this duty of precaution and care, he is responsible for any injury which may happen through a defect of machinery which was or ought to have been known to him, and was unknown to the employé or servant. But if the employé knew of the defect in the machinery from which the injury happened, and yet remained in the service and continued to use the machinery without giving any notice thereof to the employer, he must be deemed to have assumed the risk of all danger reasonably to be apprehended from such use, and is entitled to no recovery."

The doctrine thus announced exactly fits the case in hand. An essential prerequisite to the right of recovery is the fact that the defect in the machinery was unknown to the employé or servant. The facts of this case, as already carefully analyzed, show conclusively that plaintiff knew all about the alleged unfitness of the tamping rod. Certainly he knew as much about it as the defendants themselves could have known. In the case of Southern Pac. Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530, 38 L. Ed. 391, the supreme court exhaustively considers the subject now under discussion, and reviews many authorities, state and national, on the subject. In that case the plaintiff sought to recover from the defendant for injuries sustained by him by reason of an alleged defective and dangerous frog employed by defendant in the yard where plaintiff was at work. It was claimed that the defendant was negligent in using in its switches what is called an "unblocked frog" when it might have used some other and a safer kind. In that case, on page 152, 152 U. S., page 531, 14 Sup. Ct., and page 395, 38 L. Ed., the supreme court quotes with approval from a New York case (Sweeney v. Envelope Co., 101 N. Y. 520, 5 N. E. 358, 54 Am. Rep. 722) as follows:

"The defendant could not be required to provide himself with other machinery or with new appliances, nor to elect between the expense of doing so and the imposition of damages for injuries resulting to servants from the mere use of an older or different pattern. * * * The general rule is that the defendant accepts the service subject to the risks incidental to it, and where the machinery and implements of the employer's business are at that time of a certain kind and condition, and the servant knows it, he can make no claim upon the master to furnish other or different safeguards."

The court, after citing many authorities to the same effect, concludes thus:

"The evidence showed that Seley had been in the employ of the defendant for several years as brakeman and as conductor of freight trains; that his duty brought him frequently into the yard in question to make up his trains; that he necessarily knew of the form of frog there in use; and it is not shown that he ever complained to his employers of the character of frogs used by them. He must, therefore, be assumed to have entered and continued in the employ of the defendant with full knowledge of the dangers asserted to arise out of the use of unblocked frogs."

It is said in Kohn v. McNulta, 147 U. S. 238, 241, 13 Sup. Ct. 298, 299, 37 L. Ed. 150, 152, in a case where defendant company was sued for injury to plaintiff occasioned by the use of cars having bumpers of unusual length, which defendant received from another road, as follows:

"It is not pretended that these cars were out of repair or in a defective condition, but simply that they were constructed differently from the Wabash cars, in that they had double deadwoods or bumpers of unusual length to protect the drawbars. But all this was obvious to even a passing glance, and the risk which there was in coupling such cars was apparent. It required no special skill or knowledge to detect it. The intervener was no boy, placed by the employer in a position of undisclosed danger, but a mature man, doing the ordinary work which he had engaged to do, and whose risks in this respect were obvious to any one. Under those circumstances, ne assumed the risk of such an accident as this, and no negligence can be imputed to the employer."

See, also, Railroad Co. v. Voight, 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560.

Numberless cases of this kind might be referred to, but the foregoing are sufficient to show that the rule which we apply to this case has been for a long time firmly established by the court of last resort. Applying the maxim, "Volenti non fit injuria," we are constrained to hold that, under the facts of this case, plaintiff was not entitled to recover, and that the trial court erred in not giving an instruction to that effect at the close of the case. The judgment is reversed, and the cause remanded for a new trial.

CALDWELL, Circuit Judge (dissenting). The plaintiff was a miner, and received the personal injuries complained of while working in the defendants' mine. The plaintiff alleges that the defendants did not furnish him with a proper or reasonably safe tamping rod to work with, and that, as a result of this negligent act of the defendants, he received the injuries complained of. The duty of mine owners to their employés is stated by the supreme court of the United States in this language:

"Occupations, however important, which cannot be conducted without necessary danger to life or limb, should not be prosecuted at all, without all reasonable precautions against such dangers afforded by science. The necessary danger attending them should operate as a prohibition to their pursuit without such safeguards. Indeed, we think it may be laid down as a legal principle that in all occupations which are attended with great and unusual danger there must be used all appliances readily attainable, known to science, for the prevention of accidents, and that the neglect to provide such readily attainable appliances will be regarded as proof of culpable negligence." Mather v. Rillston, 156 U. S. 391, 15 Sup. Ct. 464, 39 L. Ed. 464.

In Mining Co. v. Berberich, 36 C. C. A. 364, 94 Fed. 329, this court recognized and applied this rule. It is only by disregarding this rule that the judgment of the lower court can be overthrown in this case, for there was abundant testimony from which the jury might well find that the tamping rod furnished the plaintiff to work with was not the proper kind of tamping rod for the work given him to do, and was not a reasonably safe implement to work with. The testimony is too voluminous to quote at length, but a brief excerpt from a considerable mass of testimony to the same effect will show there is enough testimony on this point to support the verdict of the jury.

Mr. Harry Allen Lee, an old and experienced miner, and the commissioner of mines for the state of Colorado, whose official duties required him to inspect the mines in the state, and the methods of operating them, including the machinery, implements, and tools used in their operation, testified in part as follows:

"Q. What are the proper and recognized safe and reasonable bars or implements used for the purpose of tamping, Mr. Lee? A. Wooden tamping bars were commonly used. Q. Are those more safe and reasonable for that purpose, Mr. Lee? A. I think so; yes, sir. Q. Why? A. On account of their weight, and less liability to explosion from percussion. Q. Mr. Lee, I show you an iron pipe or bar, marked as an exhibit in this court,—Exhibit C. State whether or not the use of such a bar as that, from five to seven feet long, for the purpose of tamping giant powder, is a reasonably safe and proper tamping implement? A. I think not, sir. Q. Mr. Lee, in connection with your duties as mining inspector, is it a part of your duty to gather statistics concerning accidents of various kinds that happen in the mines? A. Yes, sir. Q. And to keep a record of those accidents, and to investigate the causes of them? A. Yes. Q. Have you had completed records of accidents resulting from the use of iron tamping bars? A. My records so show; yes, sir. Q. Do you base your opinion and statement to the court and jury that iron tamping bars are not reasonably safe and proper, to any degree, upon the results of your investigations showing the injuries and deaths resulting from the use of iron tamping bars? A. Yes, sir."

And again the witness says, "In the large mines, iron tamping bars are not permitted."

Mr. J. A. Gilmore, a witness who had been engaged in mining for 30 years, and who had during that time held the positions of foreman, shift boss, and superintendent of mines, testified as follows:

"Q. In your observation, however, of mines, even where machines were not used, what would you state to the jury was the general custom as to the kind of tamping bars used? A. Well, for tamping giant powder we used to always use wood. I have always had it used where I was. Q. And, from your observation, what would you say was the general kind of tamping bar used in connection with giant powder? A. Wood. Q. Even in mines where machine drilling is not used? A. Yes, sir."

Confirmatory of the testimony of this witness, it may appropriately be stated that since the accident to this plaintiff the legislature of the state has passed an act prohibiting the use of iron tamping rods in the mines of the state, under heavy penalties.

The proposition being settled that the iron tamping bar was not a reasonably safe or proper tool, why should not the plaintiff recover? The court's answer to this question is that he assumed the risk. It was the duty of the defendants to furnish the plaintiff with a reasonably safe and suitable tool to work with, and the plaintiff had a right

to act upon the presumption that they had done so. The duty of furnishing the tool and determining whether it was a reasonably safe and proper tool rested upon the defendants, and not upon the plaintiff. Railway Co. v. Jarvi, 3 C. C. A. 433, 53 Fed. 65. The risk the plaintiff assumed was the risk which necessarily attended the work after being supplied with suitable tools. He did not assume any risk incident to the business growing out of the negligence of the defendants to supply him with a suitable and safe tool to work with. There is some confusion in the law of negligence on some points, but all the authorities agree that a servant does not assume the risks incident to the negligence of his master. The risk consequent upon the failure of the master to properly discharge his duty to furnish the servant with a reasonably safe place to work, or reasonably safe tool to work with, is not a risk which the servant assumes. But it is said the plaintiff ought to have known the tamping rod furnished him was unsafe. But he says emphatically that he did not know it, and, if there is anything at all settled in the jurisprudence of this country, it is that the jury, and not the judges of an appellate court, are the exclusive judges of the credibility of witnesses. But whether the plaintiff knew or ought to have known the dangerous character of the tamping rod was a question of fact for the jury, upon a consideration of all the evidence. In the case of Jones v. Railroad Co., 128 U. S. 443, 9 Sup. Ct. 118, 32 L. Ed. 478, the circuit court directed the jury to render a verdict for the defendant upon the ground that the plaintiff had been guilty of contributory negligence, but the supreme court reversed the judgment. The court, speaking by Mr. Justice Miller, said:

"But we think these questions [of negligence] are for the jury to determine. We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as this, as well as others. * * * Instead of the course here pursued, a due regard for the respective functions of the court and jury would seem to demand that these questions should have been submitted to the jury, accompanied by such instructions from the presiding judge as would have secured a sound verdict."

And the lower court rightly pursued the course here indicated, and instructed the jury so fully and fairly on the law of the case that no exceptions were taken to the charge.

In the case of Railroad Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 683, 36 L. Ed. 485, 489, the court said:

"It is only where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence is ever considered one of law for the court."

And where the lower court took a case from the jury, saying, "There was very little discrepancy in the testimony," the supreme court reversed the judgment, and said:

"The judge also tells us that there was very little discrepancy in the testimony; but where there is any discrepancy, however slight, the court must submit the matter to which it relates to the jury, because it is their province to weigh and balance the testimony, and not the court's." Barney v. Schmeider, 9 Wall. 248, 19 L. Ed. 648.

The jury who tried the case, and who saw and heard the witnesses testify, by their verdict have said that the tamping rod furnished the

plaintiff by the defendants to work with was not a reasonably safe tool for the purpose, that the plaintiff was not advised and did not know of its dangerous character, and that his injuries resulted from its unfitness for the work. The learned and experienced trial judge, who also saw and heard the witness testify, refused to direct a verdict for the defendants, approved the verdict the jury rendered, and refused a new trial. Upon this state of facts, the language of the supreme court of the United States in the recent case of Supreme Lodge v. Beck (Oct. term, 1900) 21 Sup. Ct. 532, 45 L. Ed. ——, is extremely pertinent:

"The principal question discussed by counsel for plaintiff in error, and the important question in the case, is whether the trial court erred in refusing a peremptory instruction to find a verdict for the defendant. It is said that the testimony established the fact of suicide, and that there was no sufficient doubt in respect thereto to justify a submission of the question to a jury. We have recently had before us a case coming, like this, from the trial court, through the court of appeals (Patton v. Railway Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361), in which the action of the trial court in directing a verdict was vigorously attacked as an invasion of the province of the jury to determine every question of fact. That case stands over against this, for there the trial court directed a verdict. Here it refused to direct it. In each case its action was approved by the court of appeals. 36 C. C. A. 467, 94 Fed. 751; 37 C. C. A. 56, 95 Fed. 244. In that case, although the question was doubtful, we sustained the rulings of the lower courts, and the considerations which then controlled us compel a like action in the present case. We said that a trial court had the right, under certain conditions, to direct a verdict one way or the other (citing several cases to that effect), but added: 'It is undoubtedly true that cases are not to be lightly taken from the jury, that jurors are the recognized triors of questions of fact, and that ordinary negligence is so far a question of fact as to be properly submitted to and determined by them. Railroad Co. v. Powers, 149 U. S. 43, 13 Sup. Ct. 748, 37 L. Ed. 642. Hence it is that seldom an appellate court reverses the action of a trial court in declining to give a peremptory instruction for a verdict one way or the other. At the same time, the judge is primarily responsible for the just outcome of the trial. He is not a mere moderator of a town meeting, submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who, in our jurisprudence, stands charged with full responsibility. He has the same opportunity that jurors have for seeing the witnesses, for noting all those matters in a trial not capable of record; and when, in his deliberate opinion, there is no excuse for a verdict, save in favor of one party, and he so rules by instructions to that effect, an appellate court will pay large respect to his judgment.'"

It will be observed this rule works both ways, and when the trial court refuses to direct a verdict the "appellate court will pay large respect to his judgment." The doctrine of the court in this case is in flat contradiction of the opinion of the court in the case of Southern Pac. Co. v. Yeargin (at the present term) 109 Fed. 436. Moreover, the degree of proof required to establish contributory negligence must not be overlooked. The rule is "that the evidence against the plaintiff must be so clear as to leave no room to doubt, and all material facts must be conceded or established beyond controversy." Field, Dam. 519; Beach, Contrib. Neg. § 447; Railway Co. v. Sharp, 27 U. S. App. 334, 11 C. C. A. 337, 63 Fed. 532; Railroad Co. v. Gladmon, 15 Wall. 401, 21 L. Ed. 114; Railroad Co. v. Horst, 93 U. S. 291, 23 L. Ed. 898; Hough v. Railroad Co., 100 U. S. 213, 25 L. Ed. 612; Railroad Co. v. Mares, 123 U. S. 710, 720, 721, 8 Sup. Ct. 321, 31 L. Ed.

296. For a collection of the cases and the reasoning in support of his dissent in this class of cases, the writer refers to his dissenting opinion in Railroad Co. v. Whittle, 20 C. C. A. 196, 74 Fed. 296, 301, and Finalyson v. Milling Co., 14 C. C. A. 492, 67 Fed. 507, 513. The judgment of the circuit court should be affirmed.