MOON-ANCHOR CONSOL. GOLD MINES, Limited, v. HOPKINS.

(Circuit Court of Appeals, Eighth Circuit. October 14, 1901.)

No. 1,479.

1. APPEAL AND ERROR—EVIDENCE TO SUSTAIN VERDICT — GROUNDS EXCLUDED BY TRIAL COURT.

A verdict cannot be sustained upon grounds which the trial court explicitly excluded from the consideration of the jury by its rulings and instructions; nor can the appellee be heard to urge such grounds in the appellate court, where he took no exceptions to such rulings or instructions.

2. MASTER AND SERVANT—UNSAFE PLACE TO WORK—ASSUMED RISK.

The general rule in respect to the duty of a master to provide his servants with a reasonably safe place in which to work cannot be applied to a case where a servant when injured is engaged in performing such duty of the master, by making safe a place which has become dangerous during the progress of the work, or from the manner in which the work was done. In such case the relation between the master and servant is changed, and the servant assumes the risk incident to the dangerous condition of the place, as one of the hazards of the employment, if he knows of it, or should know of it in the exercise of ordinary care and observation; and in an action for his injury it is immaterial whether the place originally became dangerous through the negligence of the master or not.[1]

3. SAME—ACTION FOR DEATH OF SERVANT.

Defendant was engaged in excavating a chamber in its mine for a pump house about 30 by 50 feet in size, and plaintiff's son was employed in operating a car for removing the loose rock taken out to the elevating shaft. When he had been so employed about 4 weeks, and the room

---

[1] Assumption of risk incident to employment, see note to Railroad Co. v. Hennessey, 38 C. C. A. 314.

had been excavated to the required size, except in height, a pillar left to support the roof was removed; and large quantities of rock fell, and continued to fall at intervals thereafter, rendering the room unsafe to work in. Defendant then commenced timbering next to the entrance, removing the fallen rock as the work progressed; the men being supplied with long hooks to enable them to pull out the rock while remaining under the protecting timbers. They were warned by the foreman not to go beyond the timbers. Plaintiff's son, while so working with others 10 days after such work commenced, and while under the timbers, was killed by a piece of rock which fell outside the timbers, but, striking on a pile of rock, was deflected under them. The deceased was 20 years old, but was not an experienced miner. *Held*, that there was nothing in such facts to charge defendant with a failure to exercise reasonable care and precaution to render the place as safe as the nature of the work would permit, but that the cause of the death was one of the dangers of which deceased must have known, and of which he assumed the risk, as one of the hazards of the employment.

Thayer, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Colorado.

This suit was instituted by Mary A. Hopkins, the defendant in error, against the Moon-Anchor Consolidated Gold Mines, Limited, plaintiff in error, to recover damages under the statute of Colorado for the death of her son Phineas Hopkins, alleged to have been caused by the wrongful act of the defendant. It is charged that in March, 1899, the defendant, a mining corporation, was engaged in excavating a pumping station or chamber at the sixth level of its mine, in ground liable to cave in unless supported by proper timbers; that deceased was working for defendant in the capacity of a trammer (that is, operating a car for the purpose of carrying away the loose rock and débris that might result from the excavating processes, along the drift to the elevated shaft of the mine); that while so engaged he was struck by loose and falling rock from overhead and instantly killed. The specific negligence charged against defendant corporation is that it knowingly failed and omitted to properly secure or timber the roof of the excavation so as to make it safe for employés working under it. This alleged negligence was denied by defendant, and further defenses were interposed: (1) That the risks and dangers which caused the death of plaintiff's son were necessarily incident to his employment, and were assumed by him; (2) that the station in question was at the time of his injury and death undergoing necessary repairs, and that all dangers incident to the place of work were obvious and known to him. The plaintiff at the trial introduced her evidence, and at its conclusion defendant moved the court to direct a verdict in its favor. The court declined to do so, and defendant, after saving proper exceptions, elected to introduce no evidence, but to stand on the case made by plaintiff. There were a verdict and judgment for plaintiff. Numerous errors were assigned, but the one chiefly relied on in argument, and which alone needs consideration at our hands, is that the court erred in not directing a verdict for the defendant.

O. L. Dines (Tyson S. Dines and Elmer E. Whitted, on the brief), for plaintiff in error.

W. O. Temple, F. P. Crews, and B. F. Montgomery, for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge, after stating the case as above, delivered the opinion of the court.

The only question to be answered on this writ of error is whether there was any substantial evidence to support the verdict as rendered.

The uncontradicted facts of the case are substantially as follows: The deceased, although a minor, had passed his twentieth year, and was in full possession of well-developed faculties of body and mind. He had been at work as a trammer at the sixth level of defendant's mine for a period of four weeks or more, during which time defendant had been engaged in excavating the pumping station in question. He had witnessed and participated in the work from the beginning. During this time the narrow drift which run out from the shaft had been widened and extended so as to constitute a room of about 30 feet by 50 feet in dimensions. Prior to March 18, 1899, the work of excavating the pump station had progressed so far that it had then nearly reached the lateral dimensions intended for it, but had not been excavated to the height required. Occasionally during the progress of this excavation prior to March 18th rock had fallen from the roof, but there had been no substantial caving. During the progress of the work a supporting pillar of earth and rock, 8 or 10 feet in dimensions, had been left to support the roof of the station. On March 18th this pillar was cut or shot out. This occasioned a serious cave-in or dropping of a large amount of rock from the roof of the station to the floor, and necessarily stopped such further excavation as was necessary to complete the room as originally intended. Immediately thereafter all excavating work, except such as was necessary to permit timbers to be put in place, was stopped; and from that day until the day of the accident, which occurred 10 or 11 days thereafter, all work was directed to removing the fallen rock and débris, and timbering the roof of the station to prevent further falling of the same. The defendant began the work of timbering at that portion of the station nearest the shaft, and progressed outward towards the further end of the station. This was done to permit the workmen, after the first timbers had been put in place, to do the further work of removing the fallen and falling rock under the protection of supporting timbers. While this work was progressing, rock frequently fell from various parts of the roof of the station which remained untimbered. The work of removing the rock and débris and securing the roof with timbers continued uninterruptedly from March 18th to March 28th. During all this time plaintiff's son worked with the other men in the common purpose of cleaning out the chamber and putting it into a safe condition. The physical facts, as well as the undisputed testimony of the witnesses, in our opinion, clearly show that he was fully aware of the changed situation resulting from the cave-in of March 18th and of the character of the work and the dangers incident to it which ensued thereafter. The defendant on or before March 28th had provided hooks with long iron handles to be used by the workmen in pulling rock which had fallen outside of the screening of the timbers back underneath the same. On the morning of March 29th the midnight shift, as it was called, including the deceased, came on duty, and went down to the station to work. They were shown the hooks which had been provided, and told not to go beyond that portion of the station over which the timbers had been placed; the foreman designating the same as the "dead line." The deceased went to a point in the station under the

timbers, safely inside the dead line. He had a rope in his hand, and had just made a remark to the effect that he would lasso some of the loose rock lying outside, when a large rock fell from the roof of the station just outside the timbering, to the ground below, struck on a pile of rock formed by a cave-in of the night before, was deflected under the timbers and crushed the deceased, causing his death. A critical reading of all the evidence discloses no substantial fault or want of due care on the part of the defendant in conducting the work after the cave-in of March 18th. The trial court ruled out all evidence tending to show negligence in the manner of excavating the chamber prior to March 18th; but notwithstanding such ruling the facts and circumstances suggested by questions propounded to the witnesses, and appearing in the description of the locus in quo, tended to show that the defendant had not employed ordinary care in the excavation of the station prior to March 18th. Excavating so large a cavity without supporting the roof otherwise than by leaving one pillar of earth and rock, and subsequently cutting out that pillar without making adequate provision to prevent a cave-in, were circumstances which might have justified a recovery on the ground of negligence if any one had been injured by the cave-in of March 18th. It is upon evidence of this character, unavoidably permeating the record, although ruled out as incompetent by the court, that plaintiff's counsel rely in argument and brief to establish the requisite negligence on the part of the defendant. Without pointing out any substantial acts of negligence—any want of ordinary care—in the conduct of the work in hand after March 18th, counsel for plaintiff say in their brief and argument:

"It is true that the sole question of negligence submitted to the jury by the instructions of the court was whether the defendant company, after the cave-in of March 18th, proceeded with reasonable diligence, and as a reasonably careful person would have done under the circumstances, to timber the station for the purpose of making it as safe as it reasonably could be made under the circumstances. But the negligence of the defendant in suffering its premises to become dangerous is a factor which is conspicuous in the record in this case. It was an element which the jury doubtless did consider, and which they had a right to consider, notwithstanding the court's instructions, and we have a right to rely upon this fact in support of the verdict."

For two satisfactory reasons, we cannot agree with counsel. In the first place, the case was not tried on any such theory and defendant had no opportunity to meet any such issue, and no such issue was in point of fact tried. The learned judge who sat at the trial of the case charged the jury as follows:

"There is no testimony in this case showing that the defendant was negligent in making the original excavation in the manner in which it did. * * * [All testimony to that effect having been ruled out by the court.] That question, however, could not affect the question of the liability of the defendant, as it is clearly shown by the evidence that the original excavation was not the proximate cause of the injury, and it could not be held to be liable in this case even if in that portion of the work it had been negligent. On the 18th of March, several days before this accident occurred, several tons of rock fell from the roof of the excavation, thereby demonstrating that the premises were dangerous; and these men were engaged at the time of this accident in endeavoring to make a dangerous place safe. The

question, therefore, is whether or not the defendant used ordinary care in providing a reasonably safe working place for the deceased, under the circumstances as disclosed by the evidence. In other words, if you believe from the evidence that, after the cave-in on the 18th of March, the defendant, with reasonable diligence, and in a manner such as a reasonably careful person would have pursued under all the circumstances, proceeded to timber the station for the purpose of putting the station in a condition as safe as it reasonably could be put in under all the circumstances, and that the deceased, Phineas Hopkins, knew, or by the exercise of reasonable care could have learned, the purpose of the work, then you are instructed that he must be held to have assumed the increased hazards incident to putting the station in a reasonably safe condition, of which he knew, or of which one of his age, intelligence, and experience could have learned by the exercise of reasonable diligence."

During the progress of the trial plaintiff's counsel propounded questions to several witnesses relating to the proper method of excavating the chamber originally. The following question propounded to witness King is a fair sample:

"Q. Now, Mr. King, you may tell the jury whether or not, in your opinion, based upon your observation and experience as a practical timberman, this excavation could have been secured by timbering as the work progressed so as to have avoided the cave-in and the danger to the employés."

To this question, and all others of similar character, defendant's counsel objected, and the objections were sustained by the court.

From the charge and rulings just referred to, the theory of the trial is apparent. The court refused to permit any inquiry into the method adopted in making the original excavation as a basis of the charge of negligence, and explicitly took from the jury any consideration of the facts attending the same. Plaintiff's counsel, according to the record, stood silent, taking no exceptions either to the charge or rulings, or otherwise dissenting therefrom. Instead of saving proper exceptions, submitting to an adverse verdict, and duly prosecuting a writ of error to test the correctness of the court's rulings, as, in the light of the uncontroverted facts, showing no culpable negligence after March 18th, they should have done, they resorted to the highly-improper and indefensible practice of undertaking to secure a verdict in contravention of the law as laid down by the court. Not only so, but they boldly avow in their argument and brief before us, as already seen, that, notwithstanding the instructions of the court, the jury had a right to disregard them, and to consider facts explicitly taken from them by the court. They practically concede that they must rely upon the suggestions of facts so excluded by the trial court, if the verdict and judgment below are to be sustained. In other words, they propose to try in this court a case that was not tried below, and to try it, not on the record as made, but on a record counsel say would have been made if they had had their own way,—not on evidence duly taken and preserved, but on evidence not taken or preserved; not on exceptions duly taken or assignments of error properly filed, but on mere suggestions of error now for the first time made by them. The bare statement of the proposition condemns it as revolutionary and dangerous, and, if there were nothing else to justify our judgment, we would not hesitate to say that we cannot, on the record now

before us, give any consideration to the supposed facts showing neg-ligence in the original excavation of the chamber in question. But, as the question relating to the competency of such evidence was fully argued by counsel on both sides, we have deemed it best to express our views concerning it, for the guidance of the trial court at the next trial.

We fully agree with the court in its holding that the method of making the original excavation was not the proximate cause of the injury to plaintiff's son. By "proximate cause" we mean that mov-ing or actuating cause which in the natural and orderly sequence of events, and without the intervention of another, new, sufficient, and responsible cause, produces a given result. In our opinion, a new and adequate cause of the death in question arose after the original excavation was made. It consisted of the risks and hazards attend-ing work in a dangerous place,—not one that had theretofore been dangerous, but one which by reason of the exigency of the occasion had become peculiarly hazardous and risky, and one which impera-tively needed immediate attention to render it safe. The defendant was required, on account of the catastrophe of the 18th, to proceed immediately to make a place which had become dangerous, reason-ably safe. Plaintiff's son voluntarily entered upon this new work. New relations arose between him and his employer, whereby the duties and obligations of the employer towards him had materially changed. In Finalyson v. Milling Co., 14 C. C. A. 492, 67 Fed. 507, this court had under consideration a similar question. That was a case where a miner was killed by a mass of earth falling upon him. This court, by Judge Sanborn, there said:

"It is the general rule that it is the duty of the master to exercise ordi-nary care to provide a reasonably safe place in which the servant may per-form his service. * * * But this rule cannot be justly applied to cases in which the very work the servants are employed to do consists in making a dangerous place safe, or in constantly changing the character of the place for safety as the work progresses. The duty of the master does not extend to keeping such a place safe at every moment of time as the work progresses. The servant assumes the ordinary risks and dangers of his employment that are known to him, and those that might be known to him by the exer-cise of ordinary care and foresight. When he engages in the work of mak-ing a place that is known to be dangerous safe, or in a work that in its progress necessarily changes the character for safety of the place in which it is performed as the work progresses. the hazard of the dangerous place and the increased hazard of the place made dangerous by the work are the ordinary and well-known dangers of such place, and by his acceptance of the employment the servant necessarily assumes them."

This court, also, in an opinion delivered by Judge Thayer in the case of Railway Co. v. Jackson, 12 C. C. A. 507, 65 Fed. 48, after enunciating the general rule of duty of a master to provide a reason-ably safe place for his servants to work, says:

"It frequently happens that men are employed to tear down buildings or other structures, or to repair them after they have become insecure, or it may be that the work undertaken by the employé is of a kind that is calcu-lated to render the premises or place of performance, for the time being, to some extent insecure." "In cases such as these the servant undoubtedly assumes the increased hazard growing out of the defective or insecure con-

dition of the place where he is required to exercise his calling, and the doctrine above stated cannot be properly applied."

In the case of Railway Co. v. Brown, 20 C. C. A. 147, 73 Fed. 970, in the circuit court of appeals for the Seventh circuit, a similar case was under consideration. It is there said:

"There is a duty on the part of a master to provide his servants a safe place in which to work, but manifestly that principle is not applicable to a case like this, where the place becomes dangerous in the progress of the work, either necessarily or from the manner in which the work is done."

The foregoing decisions demonstrate that the measure of duty and obligation of a master to his servant, when the work voluntarily undertaken by the servant consists in making a dangerous place safe, is materially changed from that prevailing under the general rule. It may be that negligence in making the original excavation occasioned the new risks and hazards to which plaintiff's son voluntarily subjected himself, but it cannot, in our opinion, be true that the first-mentioned negligence, remote not only in time, but in connection with the injury, was the actuating cause, when it appears that the deceased of his own free will determined to cope with these risks and hazards, and, for a price satisfactory to him, assumed the liability incident to them. In this, his own voluntary conduct, is found the intervening proximate and responsible cause of his injury. As already observed, no substantial evidence is found in the record tending to show any want of reasonable precaution or care on the part of defendant in the performance of the difficult task rendered necessary by the casualty of the 18th of March. Indeed, ingenious counsel have suggested no expedients which might have been resorted to by defendant to have more safely done the same; but they practically rest their case, for negligence, upon the attempt to connect the injury with the original excavation. This having failed, nothing is left to show negligence on the part of defendant, such as to entitle plaintiff to recover; and under the authority of the cases of Finalyson v. Milling Co., Railway Co. v. Jackson, and Railway Co. v. Brown, supra, the deceased, by voluntarily engaging in the work of making a dangerous place safe, assumed all the risks attending it which were known to him, or which by the exercise of ordinary care and foresight might have been known to him.

An effort is made to justify sending the case to the jury on the issue whether the deceased knew, or by the exercise of ordinary care might have known, the dangers incident to the work in which he was engaged. The contention that he might have worked in this dangerous place from the 18th of March to the time of his injury on the 29th of March without being informed of the notorious and manifest danger attending the work, or that he might not have heard the plain and clear caution of the foreman, or the frequent comments of his co-employés about the danger, as well as other equally improbable hypotheses of counsel, are entitled to little consideration at our hands, when we bear in mind the great and undisputed facts already referred to. He was full grown, and possessed of the usual faculties of adult manhood. He had had at least four weeks' experience in and about the very place where he sustained his injury. He

had had at least one full week's experience, in connection with other workmen, in the performance of the dangerous work undertaken by him and them. He knew all of the physical facts constituting danger. He saw them with his eyes, and heard of them with his ears. There was nothing mysterious or scientific to prevent full appreciation on his part. Such being the facts, plaintiff will not be heard to say that deceased did not know or appreciate the danger. King v. Morgan (C. C. A.) 109 Fed. 446, and cases there cited. The trial court was so impressed with the conclusion last stated that it charged the jury as follows:

"As I view this testimony, it did not require an experienced miner to determine that this place was exceedingly dangerous. I think any man of ordinary intelligence, under the facts as disclosed in this case, could have ascertained that fact; and, indeed, in view of the precautions taken by the defendant company, not only by cautioning the men, but by providing these long iron hooks to be used by them in order that they might remain under the timbers, [they] could not help but know the dangerous character of the work in which they were all engaged."

The case is therefore one in which the deceased, without any protest or objection, entered upon and continued in an employment attended with well-known, constant, and continuing danger and risk to himself. The authorities hereinbefore cited and referred to abundantly show that he voluntarily assumed all such danger and risk. This conclusion renders it unnecessary to pass upon the question, elaborately argued by counsel, whether under the statutes of Kansas the mother could maintain this action without alleging in the complaint that her minor son was unmarried.

The judgment is reversed, and the cause remanded to the circuit court, with directions to grant a new trial.

THAYER, Circuit Judge. I am unable to concur in the foregoing opinion of the majority, and, in order to make the reasons for my dissent more clear, it is necessary to make a brief further reference to the facts as disclosed by the record: The work of excavating the pumping station, which is described in the majority opinion, had been in progress about six weeks prior to the accident; and during that period the plaintiff's son Phineas Hopkins had been employed merely as a trammer, or an ordinary laborer, to remove loose rock as it was broken down by the miners. He was not a practical miner when he was employed by the defendant company, but had been raised on a farm, and had worked for a time as a teamster in a lumber yard. Testimony was offered by the plaintiff and admitted by the trial court which established the following facts: The pumping station, which was 50 feet long, and from 30 to 35 feet wide and 10 or 12 feet high, was not excavated out of solid rock, but in rock which had fissures and fractures therein, through which water percolated. Nearly a month before the accident, and before the pumping station had been excavated to the full extent contemplated, and while the excavation was under way, the head timber man of the defendant company, King, after examining the premises, advised its general foreman, Sisk, that, owing to the slippery character of the ground, the excavation ought to be caught up with timbers before

it had proceeded too far, as otherwise it would be dangerous. The same foreman was advised by a practical miner by the name of Birdsall about the 8th of March that the excavation ought to be timbered before the work of excavation proceeded further, as it was very dangerous. These warnings were both disregarded, the work was allowed to proceed, and an excavation was made of the dimensions heretofore stated, leaving in the meantime nothing to support the roof but a single pillar of earth and rock about 8 by 10 feet in dimensions, which was left standing at the extreme end of the excavation immediately adjoining the shaft. Orders were eventually given to shoot out this support, and it was removed before any timbering was done; and when such order was given, or shortly prior thereto, the shift boss, Wilson, advised Sisk, the foreman, and Rickard, the superintendent of the mine, who gave the order, that the ground was dangerous, and that timbers ought to be put in before the support was removed, but this warning was also disregarded. Some rock fell out of place as the excavation progressed before it was fully completed, and shortly after the support at the end thereof was shot down a very large mass of rock fell; and it was not till then that any effort was made to support the roof of the excavation by timbers, although it was substantially completed, and nothing remained to be done but to dress down the side walls. The plaintiff below did offer to show by practical miners what was the proper way to make an excavation like this pumping station with reference to securing it overhead by timbers, but the first time a question to this effect was propounded to a witness (Birdsall) it was objected to by counsel for the defendant company as being a question "for the jury to decide," and the objection was sustained for this reason, whereupon the plaintiff, as the record shows, duly excepted. In view of the testimony aforesaid, the record, in my opinion, contains abundant evidence, which was admitted by the trial court as competent and relevant, to warrant the conclusion by any jury that the excavation was made in a negligent and reckless manner, which endangered the lives of all who were engaged in the work. This conclusion is reached substantially in the opinion of the majority. The majority opinion contains the statement that "the trial court ruled out all evidence tending to show negligence in the manner of excavating the chamber prior to March 18th." But this statement evidently refers to the action of the trial court in refusing to permit practical miners to testify how, according to the custom of miners, the excavation ought to have been timbered. The trial court in its charge remarked incidentally that it had ruled out testimony of that character, and the record supports that statement. It did not, however, exclude the testimony above alluded to, which was in itself sufficient to convince any jury that the excavation was carelessly made; and the trial court clearly erred in its charge when it made the remark quoted in the majority opinion: "There is no testimony in this case showing that the defendant was negligent in making the original excavation in the manner in which it did." That is an error, however, of which the defendant cannot be heard to complain, and from which it ought to derive no benefit. If it desired to show that

the excavation in question was properly made, it should have introduced evidence to that effect, as there was abundant proof to the contrary. Moreover, if, as the majority opinion suggests, the lower court tried the case on the theory that it was immaterial whether the pumping station had been excavated properly or improperly, and if that was an erroneous theory, the defendant ought not to complain because it induced the court to adopt that view by its objections to evidence, and by insisting that it was the correct view. It is very clear that the plaintiff's counsel did not bring the suit or prosecute it upon any such theory, and, even if the trial court did not admit all of the testimony which the plaintiff offered with a view of showing that the station was not excavated as it should have been, yet it did admit enough evidence to make it plainly apparent that the work in question was done carelessly, and that the excavation was rendered needlessly unsafe.

The principal proposition, however, which is enunciated in the majority opinion, is that the negligence of the defendant company, conceding it to have been negligent, was not the proximate cause of the injury. This proposition implies, of course, that, after having rendered the excavation needlessly unsafe by failing to shore up the roof with timbers as the work of excavation progressed, the defendant could then call upon its employés to make it safe, and, if they were hurt while so doing, assert that it was not its fault. I have not been able to conclude that this is either a sound or a just doctrine. The cases cited in its support are cases where the place was rendered unsafe without the master's fault, as where in doing some necessary work in a proper manner the place where the servant worked was rendered temporarily insecure. In the case in hand the place was needlessly made unsafe by the master's negligence. But, aside from this view, the question of proximate cause in a given case is ordinarily one for the jury. It is a question of fact to be determined in view of the circumstances of fact attending the particular occurrence, as was said by the supreme court in Railway Co. v. Kellogg, 94 U. S. 469, 474, 24 L. Ed. 256, and by this court in Southern Pac. Co. v. Yeargin, 109 Fed. 436, 439. Besides, in the case in hand nothing occurred after the defendant's negligence to break the natural sequence of events, and interpose some other efficient cause. The defendant made this place dangerous without any necessity for so doing, and immediately ordered its servants (the deceased among the number) to remedy the defect by shoring up the roof, that ought to have been shored up as the work progressed, and by removing the rock which had fallen from the roof onto the floor of the excavation. In the light of these facts, the only charge, as it would seem, that ought to be brought against the deceased, is that he was guilty of contributory negligence in consenting to work in such a place, rather than that his consenting to do the work which he was ordered to do was the sole efficient cause of his death. I am willing to concede that if the deceased had worked out in the open excavation, where stones were dropping from the roof, he would have been guilty of contributory negligence. But the proof shows incontestably that he was not so working; that he stood at the time he was

killed under a narrow covered way, protected overhead by timbers, where he was at least measurably safe, and was pulling in loose rock with an iron hook, and tramming them along the covered way to the shaft.   He was a young man (not yet twenty-one years old), and inexperienced in mining; and he was in company with experienced miners, whose presence and example would naturally have much influence on the conduct of a young man of his age.   Under these circumstances, no court ought to say, as a matter of law, that he was guilty of contributory negligence in being where he was at the time of his death.   Whether he was thus guilty was, in my opinion, a question for the jury; and that question was decided by the jury in his favor, and, as I think, correctly decided.   After a careful perusal of the testimony I am of opinion that the failure of the defendant company to shore up the excavation as the work progressed, thereby rendering it exceedingly dangerous, was the efficient cause of the death of the plaintiff's son; that the verdict was for the right party; that no errors were committed to the prejudice of the defendant of which it can be heard to complain; and that the judgment below ought to be affirmed.