HEALD, RECEIVER, *v.* WALLACE *et als.*

(*Knoxville.*    September Term, 1902.)

1.  **ABATEMENT.  Death of one of several plaintiffs before
    judgment.**

    Where pending an action in *tort* for the negligent killing of
    a person, brought by several parties plaintiff, as the next
    of kin of decedent, one of the co-plaintiffs dies before judg-
    ment, the action as to him abates and can not be revived
    in the name of his administrator. (*Post, pp.* 350-351.)

    Cases cited:  Loague *v.* Railroad, 91 Tenn., 458; Railroad
    *v.* Bean, 94 Tenn., 388.

2.  **SAME.  No abatement, by death of one or more of sev-
    eral plaintiffs after judgment—Why.**

    The death of one or more joint plaintiffs *after* judgment in
    an action in *tort*, and pending an appeal, does not work an
    abatement of the suit as to such decedents, because the
    judgment converts the *tort* into a debt, and the appeal does
    not vacate, only suspends, the judgment. (*Post, p.* 351.)

    Cases cited:  Akers *v.* Akers, 16 Lea, 7; Kimbrough *v.* Mitch-
    ell, 1 Head, 540; Baker *v.* Dansbee, 7 Heisk., 231.

3.  **SAME.  Death of one of several statutory beneficiaries
    does not work abatement as to the others.**

    Upon the death of a person caused by the wrongful act or omis-
    sion of another, the statutory beneficiary of the right of
    action therefor is that person or class of persons named in
    the statute as being entitled to the recovery at the death
    of the decedent.  If that beneficiary be *one* person who dies,
    the action abates; but if the right of action accrues to a *class*
    of persons, and there are several persons composing that
    *class*, the death of one or more of them, either before or
    after suit brought, will not work an abatement of the cause
    of action as to the *others* of the class surviving; and the
    survivors, if liability is established, are entitled to recover
    full damages, notwithstanding the right of action of one or

Heald, Receiver, v. Wallace, *et als.*

more members of the class has been extinguished by death. (*Post, pp.* 351-353.)

Code construed:  Sec. 4573 (S); 3564 (M. & V.), secs. 2851, 2852 (T. & S.).

Case distinguished:  Railroad Co. *v.* Bean, 94 Tenn., 388.

4. **DEMURRER TO EVIDENCE.  Objection to admissibility of evidence waived by—when.**

It is well settled that a demurrer to the evidence waives objections interposed to the admissibility of evidence by the party who files the demurrer.  (*Post, pp.* 353-354.)

Case cited:  Railway Co. *v.* Leinhart, 107 Tenn., 635.

5. **SAME.  Will not preclude consideration of plaintiff's evidence improperly excluded.**

A defendant by demurring to the evidence can not deprive plaintiff of the right to make available questions upon rulings of the trial court excluding competent evidence. (*Post, pp.* 354-355.). ·

Case cited:  Washburn *v.* Shelby County, 104 Ind., 321.

6. **SAME.  To avail plaintiff, evidence improperly excluded must be preserved by bill of exception.**

The demurrer to the evidence is a mere pleading and brings before the supreme court only the admitted evidence; therefore, to entitle plaintiff to have considered by the supreme court such portions of his evidence as were improperly excluded by the trial court, the same must be preserved and made part of the record by bill of exceptions, duly authenticated by the signature of the trial judge.  (*Post, pp.* 355-356, 357.)

Cases cited:  Nance *v.* Chesney, 101 Tenn., 470; State *v.* Hawkins, 91 Tenn., 140; Garrett· *v.* Rogers, 1 Heisk., 321; Wynn *v.* Edwards, 7 Humph., 419.

7. **SAME.  Plaintiff can assign errors on appeal of defendant, when.**

The supreme court will review the action of the trial court in excluding testimony of plaintiff, on appeal of defendant whose demurrer to the admitted evidence has been overruled, provided the excluded testimony is made a part of the record by bill of exceptions; otherwise, great injustice might be done plaintiff.  (*Post, pp.* 355, · 356-357.)

Heald, Receiver, v. Wallace, *et als.*

8. **MASTER AND SERVANT.** Safe place to work—Mines.

The general rule of law—the common law—making it the duty of the master to furnish the servant with a safe place to work is usually applied to a permanent place and does not apply to such places as are constantly shifting and are being transformed as the direct result of the servant's labor, as a room or place to work in a mine. (*Post, pp.* 364-365.)

Cases cited: Finalyson *v.* Mining Co., 14 C. C. A., 492, 67 Fed., 510; Railroad Company *v.* Jarvi, 53 Fed., 65; Mining Co. *v.* Clay's Admr. (Ohio), 38 N. E., 610.

9. **SAME.** Same. Increased hazards assumed by servant—When.

The duty of the master does not extend to keeping safe the place of the servant's labor where the place is known to be dangerous, or where the work which the servant is employed to do consists in making a dangerous place safe or in constantly changing the character of the place for safety by the labor performed, as in an entry room of a mine; in such cases the hazard of the dangerous place and the increased hazard of the place made dangerous by the work are the ordinary and known dangers of the employment, assumed by the servant. (*Post, pp.* 365-368.)

Cases cited: Fraser *v.* Lumber Co., 45 Minn., 235; McGinty *v.* Reservoir Co., 155 Mass., 183; Coal Co. *v.* Scheller, 42 Ill. App., 619; Armour *v.* Hahn, 111 U. S., 313; Blazenic *v.* Coal Co. (Iowa), 72 N. W., 292; Minneapolis *v.* Lundin (C. C. A.), 58 Fed. Rep., 525; Railroad Co. *v.* Jackson (C. C. A.), 65 Fed. Rep., 48; Railroad Co. *v.* Brown (C. C. A.), 73 Fed. Rep., 970.

Case distinguished: Iron Co. *v.* Pace, 101 Tenn., 484.

10. **SAME.** Mining Act of 1881, Construction of.

The act of 1881, ch. 170, providing for "the ventilation of coal mines and collieries, and for the protection of human life," charges the mine owner with the duty of employing a competent and practical inside overseer to be called the "mining boss;" upon the mine boss so employed is imposed the duty of maintaining a careful watch over the ventilation and timbering, and to see, as the miners advance in their excavation, that all loose coal, rock or slate overhead is secured against falling, and all other matters connected with or pertaining to

Heald, Receiver, v. Wallace, *et als.*

the safety of the men at work in the mine; and the miner having charge of the working place is charged with the duty of keeping the roof thereof properly propped and timbered to prevent the falling of coal, slate or rock. These duties are reciprocal and are obligations imposed upon the mine owner and miner alike—equally imperative and binding upon both, and the penalty for a violation thereof is denounced against all the parties named. (*Post, pp.* 368-370.)

**11. SAME. Same. Question reserved.**

Can the custom of a mining company or a *rule* for the government of its employees, made and published by the company, relieve the employer of the statutory duty imposed upon him? Decision reserved. (*Post, pp.* 370-372.)

**12. CONTRIBUTORY NEGLIGENCE. Bars action when. Case in judgment.**

Plaintiff's decedent, a miner of many years' experience, was employed by defendant and while engaged in driving the neck of a work room he uncovered a large rock in the roof of said room; he continued to work under this overhanging rock for parts of two days—from ten to fourteen work hours —further uncovering and undermining it with full knowledge of the danger, instead of suspending work and either placing proper timber supports thereunder or calling upon the mine boss to do so; when he had excavated and removed the last natural support of said rock, it fell upon and killed him. Action by next of kin for death.

HELD: That deceased was guilty of gross contributory negligence which was the proximate cause of the accident producing his death, and that therefore the action could not be maintained. (*Post, pp.* 357-360, 372-374.)

---

FROM KNOX.

---

Appeal in error from the Circuit Court of Knox County. JOSEPH W. SNEED, Judge.

LUCKY, SANFORD & FOWLER, for Heald, receiver.

E. F. MYNATT and PICKLE & TURNER, for Wallace.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The plaintiffs below, as next of kin of Pharaoh C. Wallace, deceased, recovered a verdict and judgment against T. H. Heald, receiver of the Black Diamond Coal Company, for the sum of $5,000, as damages for the alleged negligent killing of the said decedent. The receiver appealed, and has assigned errors.

The first assignment is that the entire suit has now abated, and is not subject to revivor. This contention is based on the following facts: The suit was originally brought by James Wallace and his nine brothers, alleging that they were the children and next of kin of the said Pharaoh C. Wallace, who was killed while in the employment of said receiver. It appears that four of the plaintiffs have died since this suit was instituted. James Wallace died prior to the trial in the circuit court, while his three brothers, John, Charles, and William Wallace, have died since the judgment in the circuit court, and pending the appeal; their deaths having been suggested and admitted in this court. A motion is now pending in this court to revive the suit in the name of the several administrators of the three plaintiff's dying since the judgment below. The effect of the death of James Wallace, who died before the

trial of the suit in the circuit court, was to abate the suit as to him, and it is not insisted it can be revived in the name of his administrator. The reason why such revivor could not be had was stated in *Loague* v. *Railroad,* 91 Tenn., 458 (19 S. W., 430), and in *Railroad Co.* v. *Bean,* 94 Tenn., 388 (29 S. W., 370).

But as to the three plaintiffs, John, Charles, and William Wallace, who died after the judgment in the circuit court was rendered, and pending the appeal, the rule is otherwise, and the suit may be revived in the name of their respective administrators. The reason is that by the judgment below the tort has become converted into a debt, and the appeal has not vacated, but only suspended, the judgment. This rule has been recognized by this court in libel cases, although expressly excluded from the statute authorizing revivor of action in this State. Shannon's Code, sec. 4569. We have held that where the tort has become merged in the judgment the statute is inapplicable. *Akers* v. *Akers,* 16 Lea, 7 (57 Am. Rep., 207); *Kimbrough* v. *Mitchell,* 1 Head, 540; *Baker* v. *Dansbee,* 7 Heisk., 231.

It is insisted, however, that the effect of the death of James Wallace before the trial below was to abate the proportional right of action vested in him, and, as a legal consequence, to abate the entire right of action in favor of all the plaintiffs. This contention seems to be based by learned counsel largely on the case of *Railroad Co.* v. *Bean,* 94 Tenn., 388 (29 S.

W., 370). In that case it was held that a suit brought by an administrator for the sole benefit of the widow of plaintiff's intestate, there being no surviving children, was abated by the death of the widow after judgment in the circuit court in favor of defendant, and pending the administrator's appeal, and could not be revived either by her personal representative, or for the benefit of the father of the plaintiff's intestate, as next of kin. The court said: "We think the exclusive statutory beneficiary was that person or class of persons who were entitled to recovery at the death of deceased, when the cause of action accrued. In this case it was the widow, and, in the language of the statute, the right of action passed to her, or to the administrator for her benefit. The right of recovery having once vested in the widow, it did not pass upon her death to her personal representative, neither did it revest in the next of kin of deceased; the reason being that no provision is made in the statute for such contingency. The cause of action, upon the death of the person to whom it survived, or for whose benefit it might be prosecuted, was thereby extinguished."

It will be observed that in the Bean case we expressly stated that "the exclusive statutory beneficiary was that person or class of persons who were entitled to the recovery at the death of the deceased, when the cause of action accrued." If James Wallace had been the sole next of kin, the entire suit:

Heald, Receiver, v. Wallace, *et als.*

would have abated upon his death; but since there were others, constituting the class to which he belonged, his death, while abating the suit as to him, in no manner affects the rights of the others. The death of one might affect the distribution of the recovery, but certainly it does not diminish the liability of the defendant company, even proportionately. The parties surviving and proving heirship, if liability is established, are entitled to recover full damages, notwithstanding the right of action of one member of the class has been extinguished by his death. Shannon's Code, sec. 4573; Caruthers' Hist. Lawsuit, sec. 235.

It is next insisted, on behalf of the next of kin, that the trial court improperly excluded certain alleged statements of the mine boss and timberman, and that this court on the present appeal can review this action, and, if the excluded evidence is found competent, it may now be considered by this court in determining whether the demurrer to the evidence was properly overruled. It will be perceived this question is made in this court by the successful party on the appeal of the unsuccessful party, and the position assumed is that, if this court should be of opinion the demurrer to the evidence was improperly overruled on the admitted evidence, the excluded evidence was competent, and, considering it, the demurrer should still be overruled. It is well settled that a demurrer to the evidence waives objections interposed to the admissi-

bility of evidence by the party who files the demurrer. *Railway Co.* v. *Leinart,* 107 Tenn., 635 (64 S. W., 899). But it will be perceived that the present case does not fall within the rule announced in the Leinart case. Here the plaintiff's evidence was excluded on the objection of the defendant company.

The defendant then demurred to the admitted evidence, the demurrer was overruled, and damages afterwards assessed by a jury. Defendant company then appealed to this court. It is now insisted on behalf of defendants in error, the next of kin to Wallace, that, in order to test the sufficiency of the demurrer to the evidence, this court should now consider the evidence which they claim was improperly excluded by the circuit court.

In *Washburn* v. *Shelby Co.,* 104 Ind., 321 (3 N. E., 757, 54 Am. Rep., 332), Judge Elliott, delivering the opinion of the court, said: "We do not think that the fact that the appellee demurred to the appellant's evidence precludes him from availing himself of a ruling excluding competent evidence. To hold that a party demurring to the evidence may render unavailing a ruling made against his adversary, excluding competent testimony would work great injustice; for, by so holding, we should lay down a rule that would enable a defendant to secure erroneous rulings on the admission of evidence, and then, by demurring to the evidence admitted, deprive the plaintiff of the benefit of the rulings excluding evidence, however erroneous

they might be, and however great the injury done to him by such rulings.   The case is not at all like that of the demurring party asking a review of rulings upon the admission and exclusion of evidence, for he, by his own act, submits the cause for decision upon the evidence received by the court, and thus impliedly waives all questions upon rulings made in the course of the trial, but his adversary does no affirmative act waiving rulings to which he has reserved proper and timely exceptions.  .  .  .   We hold that a defendant who demurs to the evidence can not deprive the plaintiff of the right to make available questions upon rulings excluding facts."

It is true that in an Indiana case the demurrer to the evidence had been sustained, and the cause was in the appellate court on the appeal of the plaintiff. Here the demurrer to the evidence was overruled, the plaintiff's damages assessed, and the case appealed to this court by the defendant.

Two questions now arise:   (1) Whether plaintiffs can assign errors on the appeal of the defendant; and (2) whether plaintiffs should not have preserved the excluded evidence by bill of exceptions?

Considering this last question first, we are of opinion that, following the general practice, a bill of exceptions, duly authenticated, should have been taken to the action of the trial judge in excluding the evidence.   A demurrer to the evidence is a mere pleading, and only brings before the court the admitted

evidence. It is well settled that evidence excluded by a chancellor can not be considered by this court unless made part of the record by bill of exceptions, or unless spread upon the minutes with the exceptions and the action of the chancellor thereon. *Nance* v. *Chesney,* 101 Tenn., 470 (47 S. W., 690).

The testimony in a law case can not be considered unless precisely identified and authenticated by the court by bill of exceptions. In *State* v. *Hawkins,* 91 Tenn., 140 (18 S. W., 114,) it was held, approving *Garrett* v. *Rogers,* 1 Heisk., 321, and *Wynne* v. *Edwards,* 7 Humph., 419, that, where the bill of exceptions is not duly authenticated by the signature of the trial judge, it can not be treated as a part of the record, even though it is recited in the minutes that the bill of exceptions was signed by the trial judge and made a part of the record.

The question then remains, whether, on the appeal of the defendant, the plaintiff, who has preserved the excluded testimony, can assign as error the action of the court. Unless such practice is allowable, we can see how great injustice might be done the plaintiff. Although he has a verdict in his favor, if this court should reverse the action of the lower court overruling the demurrer to the evidence, and sustain it, the result would be a dismissal of plaintiff's suit, although material evidence in his favor had been improperly excluded by the trial court, which, if considered, would show a good cause of action.

Heald, Receiver, v. Wallace, *et als.*

Unless plaintiff can assign this error on the appeal of the defendant, he is remediless and at the mercy of the successful demurrant.

We are of opinion the action of the trial court in excluding competent evidence may be reviewed by the appellate court on the appeal of the defendant, whose demurrer to the admitted evidence had been over-ruled or sustained, provided the excluded evidence is made part of the record by bill of exceptions. But the excluded evidence can not be considered in this cause, because it has not been preserved by bill of exceptions.

The second assignment is that the court erred in not sustaining the defendant's demurrer to the evidence. This assignment, of course, necessitates a review of the facts: The deceased, Pharaoh C. Wallace, was at the time of his death employed as a miner in a mine of the Black Diamond Coal Company, then being operated by T. H. Heald, receiver. The said Wallace was engaged at the time of the accident in driving the neck of a room in No. 2, north entry, and was killed by a large rock falling from the room of the entry. Deceased was an old and experienced miner, and had been working in this particular mine (Beech Grove mine) five or six years. He had been working in this particular room about one month, and was assisted by his son, John Wallace, one of the plaintiffs, who was then a boy about fourteen years of age. This room had been necked about twenty-four

feet from the entry, and a new neck was being driven into a second room, from ten to fifteen feet. The deceased had been working in this neck about one week, and had driven it about twelve feet. The coal in this neck, commencing at the top, contained first a seam of rash, a few inches thick, lying on top of the coal; then a vein of coal about two and one half feet thick; next a seam of slate, from six to twelve inches thick; and at the bottom another seam, about seven inches thick. The death of Pharaoh Wallace occurred about eleven o'clock on the 19th of May, 1899. The day preceding his death, Wallace asked Card, the mine boss, about the top; and Card said he would send Guess, the timberman, there to timber it. About noon of that day (that is to say, the day before the accident), Guess, the timberman, came and set up a double or cross timber under a piece of slate inside the mouth of the neck; and, after setting this cross-timber, he removed two single supports within this neck, which Wallace had placed there. It appears that the rock that finally killed Wallace was partially exposed at the time Guess examined the neck and placed the double support in position. The rock fell above the place where Guess had knocked out the single timber.

It fell from the cross-timber all the length of the room neck. It was about eleven or twelve feet from the cross-timber to the far end of the rock that fell.

It appears that, after Guess set up the cross-timber, he tested the top, and had a talk with Wallace. The

latter continued to work under this overhanging rock, which was partially exposed at the time Guess examined the neck and placed the supports in position. It was what was denominated in mining parlance a "horseback," and weighed 80,000 pounds. Wallace was bound to have known of the existence of this threatening horseback, since he had himself erected props to support the top, and also saw Guess sound and test the top. Moreover, this immense overhanging rock was clearly exposed to view for at least twenty-four hours, or about ten to fourteen working hours, prior to the accident. Notwithstanding the imminent peril attending such work, especially obvious to a miner of Wallace's long experience, he continued to work, and augmented the danger by taking out the coal that supported this overhanging rock, and drove the room for two and one half to three feet or five or six feet further. It further appears that on the evening after Guess did the timbering, and the day preceding the accident, the deceased fired a mining shot in that room, knocking down a block of coal, and that, on the morning of the accident, deceased and his son put in another mining; that is to say, they took out the seam of rash that lay just under the room for a distance of two and one half to three feet. The effect of this was to uncover and remove several feet of the mining that supported this imminently dangerous rock, and in that proportion increased the peril. It further appears that, at the time of the accident, deceased was

working directly beneath this rock, engaged in digging up with his pick the layer of slate covering the bottom seam of coal for a distance of three feet. He was at work in the very place from which he had removed the layer of rash and upper seam of coal. The result was that this exposed rock, having been steadily undermined by the deceased himself, became at last dislodged, and fell, crushing Wallace beneath its superincumbent weight. John Wallace, the son, who was present, working with his father, was asked this question: "Now, as a matter of fact, that which turned the rock loose and caused it to fall was on account of your father having taken the last support from under it? Ans. I don't know, sir. Question. He had taken that support from under it? Ans. Yes, sir."

Now, upon these facts, it is insisted that the proximate cause of the accident was the gross contributory negligence of the deceased, and that the circuit judge should have sustained the demurrer to the evidence and dismissed the suit. One of the printed rules of the company, posted in plain view at the mines, at the place where the miners get their coal checks every morning and evening, was as follows: "All employees must, at the commencement of their daily work, note carefully and examine the face, sides, roof, and all parts of their working place, and satisfy themselves that the same is safe in every respect. But if, upon such examination, any employee shall find said work-

Heald, Receiver, v. Wallace, *et als.*

ing place dangerous or in want of repairs, which makes it unsafe, it shall be his duty to at once cease all operations there until such danger is removed, or proper repairs are made; and it shall be the duty of every employee, immediately upon the discovery of danger or defect, to proceed to make them safe, when it is in his ordinary duty to do so, provided he considers it safe to take the personal responsibility and risk as to injury, but the company will not be responsible for any injury he may receive while making such repairs. When it is not his ordinary duty to make such repairs, he shall immediately report to the mining boss, for him to proceed to make such repairs, [which] shall be obligatory upon him, unless he considers that he can make the repairs with safety to himself."

Charles James, a miner working in the same mine at the time of the accident, testifies, on cross-examination, that, "when a man was driving an entry or room neck, it was his duty, from time to time, to sound the top;" that the company had specific rules to the effect that every man was to sound his top; that the printed rules were posted up at the mines in plain view, where the men got their checks every morning and evening; that rule five had been a rule of the company as long as he had been working for the company; that the rules were that "it was every man's duty to examine from time to time his own working place, and see that it was in safe condition;" and that "when he was

working in a room outside of the roadway, and found the top was in bad condition, he had to set a single timber, but when he was in an entry or roadway or room neck, under the rules, it was his duty to inform the mining boss or John Guess, and stay from under it until the timber had been set by them."

Ed. Peaverly, a miner working in the same mine at the time of the accident, states that if a man was working in an entry or roadway or room neck, and found that his place was in bad condition, he would send for John Guess, the timberman, to repair it; that it was customary, or the rule for a man to first examine his top, and see whether it was in good condition, and, when he found it was not in good condition, he would send for Guess, who would come and set a cross-timber; that it was the duty of all miners, when digging in a room neck, to sound the top and see if it was in good condition, just the same as if in a room, and that they generally did this always; that if a miner was in a room neck or entry, and found his top was not in a safe condition, it was his duty to notify the boss or timberman to come and set the timbers, and "to stay from under it until the man does come and set the cross-timbers."

William Slover, a miner of twelve years' experience, working in the same mine at the time of the accident, states that, when a man was digging in a room neck or entry, it was his duty certainly, to examine his top from time to time; that "it is any man's duty to examine the

top, that digs coal; that it was the miner's business to see whether or not his top was in a safe condition, and when he found it was loose he would send after Guess or the mine foreman, and call their attention to it, and they would have it timbered; that this was the way to do; that the miner working in there all the time is familiar with the situation, while the mine boss is only in there a few minutes each day, and, of course, as he drives forward, uncovers new top from time to time, and the result is it is his business to examine the top from time to time, and see that it doesn't get loose; but when he is working in a place such as a hallway, room neck, or entry, that required double timbers, he sends for the mine boss or timberman to do that."

The foregoing testimony introduced by the plaintiffs demonstrates that, under the rules and custom of the company, it was the duty of the miner to make the necessary tests of his room neck, and, if he discovered it was not safe, he was charged with the duty of sending for the timberman, and especially was he enjoined and required to stand from under until the dangerous top was repaired. According to the testimony of plaintiffs' witnesses, the duty of inspecting the changing top of a room neck is the same as in any other part of the room. We are constrained to believe from the record that deceased not only steadily undermined the rock and brought it down upon himself, but that he was conscious of the danger,

and yet, inured for so many years to such perils, he deliberately assumed the risk.

It is argued, however, on behalf of the plaintiffs below, that it was the duty of the company to furnish its employees a safe place to work, and that the breach of this duty was the proximate cause of the accident, for which the defendant company is liable. We do not think this rule of the common law applicable in such a case. The principle invoked is usually applied to a permanent place, and not to such places as are constantly shifting and being transformed as the direct result of the employee's labor. This distinction is aptly illustrated in the following cases: In *Finalyson* v. *Mining Co.,* 14 C. C. A., 492 (67 Fed. 510), the plaintiff, a laborer engaged in mining ore, was injured by the falling of an exposed mass of substance, called "gouge," which he was endeavoring to pick down under the direction of the foreman. It was held by the United States circuit court of appeals that the rule of a safe place to work had no application, and that a verdict was properly directed for the defendant. Sanborn, circuit judge, delivering the opinion of the court said: "It is the general rule that it is the duty of the master to exercise ordinary care to provide a reasonably safe place in which the servant may perform his service. *Railway Co.* v. *Jarvi,* 3 C. C. A., 433 (53 Fed., 65). But this rule can not be justly applied to cases in which the very work the servants are employed to do consists

in making a dangerous place safe, or in constantly changing the character of the place for safety as the work progresses.   The duty of the master does not extend to keeping such a place safe at every moment of time as the work progresses.   The servant assumes the ordinary risk and dangers of his employment that are known to him, and those that might be known to him by the exercise of the ordinary care and foresight.   When he engages in the work of making a place that is known to be dangerous, safe, or in a work that in its progress necessarily changes the character for safety of the place in which it is performed as the work progresses, the hazard of the dangerous place, and the increased hazard of the place made dangerous by the work, are the ordinary and known dangers. In *Mining Co.* v. *Floyd,* Adm'r (Ohio) 38 N. E., 610 (25 L. R. A., 848), above cited, in which Clay, a miner engaged in operating a cutting machine, was killed by slate falling from the top, that had been negligently propped by Dalton, the 'filler' upon whom the duty of propping the roof had devolved by custom of the mine, the trial judge charged the jury upon the theory that 'the duty of defendant company in respect to furnishing a safe working place was such that it was liable for the negligence of Dalton, the filler, irrespective of the question of his incompetency, and of the company's knowledge thereof.'   It was held on appeal that this was error, that the doctrine of a safe place to work had no application, and that Clay and

Dalton, were fellow servants.    The court said in reference to this question:    "The claim is sought to be sustained by a class of cases which hold that the duty of the master to provide a safe working place and machinery for his employees can not be delegated so as to absolve the master from liability in case of failure of the vice principal to perform that duty.    It does not seem necessary to review these cases.    They are, as a rule, based upon the proposition that where the appliance or place is one which has been furnished for the work in which the servants are to be engaged, then the duty above stated attaches to the master.    We need not discuss this proposition, for we have not that case. Here the place was not furnished as in any sense a permanent place of work, but was a place in which the surrounding conditions were continually changing, and instead of being a place furnished by the master for the employees, within the spirit of the decisions referred to, was a place the furnishing preparations of which was in itself a part of the work they were employed to perform.    The distinction may be found in a number of cases, among which may be cited *Fraser* v. *Lumber Co.,* 45 Minn., 235 (47 N. W., 785) ; *McGinty* v. *Reservoir Co.,* 155 Mass., 183 (29 N. E., 510) ; and *Coal Co.* v. *Scheller,* 42 Ill., App. 619." See, also, *Armour* v. *Hahn,* 111 U. S., 313 (4 Sup. Ct., 433, 28 L. Ed., 440) ; *Fraser* v. *Lumber Co., supra; Blazenic* v. *Coal Co.,* (Iowa) '72 N. W., 292; City of

*Minneapolis* v. *Lundin,* 6 C. C. A., 344 (58 Fed., 525) ; *Railroad Co.* v. *Jackson,* 12 C. C. A., 507 (65 Fed., 48). In *Railroad Co.* v. *Brown,* 20 C. C. A., 147 (73 Fed, 970), it was said: "There is a duty on the part of the master to provide his servants a safe place in which to work; but manifestly the principle is not applicable to a case like this, where the place became dangerous in the progress of the work, or from the manner in which the work is done."

It is true, in *Iron Co.* v. *Pace,* 101 Tenn., 484 (48 S. W., 232), we held the charge of the circuit judge was in accord with the general rule "that it is the duty of the master to keep the premises in the prosecution of his business in a reasonably safe condition, and, if he fails to do so, he is liable to the servant for all the injuries resulting to him from such defects." That was a case where a miner engaged in driving an entry was injured in consequence of an explosion caused by the negligence of the company in permitting explosive dust and gas to accumulate in the mine. The injuries were sustained as a result of a mine-dust explosion, and the recovery was sought for breach of the statute which required the company to keep its mine, with all its entries, airways, and workings, properly ventilated and free from all dangerous and explosive gases and substances, and to have said entries, airways, and workings examined and tested by one skilled in such business every morning before said employees entered said portion of the mine, and,

if poisonous gases or other explosive gases or sub-
stances were found, to remove the same immediately,
etc.   It was also a ground of recovery in that case
that the company had breached the statute in employ-
ing an unskilled and incompetent inside overseer or
mine boss.   The duties for a breach of which a re-
covery was sought in that case were especially enjoin-
ed by chapter 170, Acts 1881, entitled "An act to pro-
vide for the ventilation of coal mines and collieries,
and for the protection of human life."   We held in
that case that the charge of the court was not so
strong as the positive mandates of the statute, and
hence it was not error to charge the general rule that
it was the duty of the master to keep his premises in
a reasonably safe condition.

   But it is claimed that defendant company is liable
under section 8, ch. 170, of the Acts of 1881, making it
the duty of the mine boss to keep a careful watch over
the timbering, etc.   That section is as follows: "That
to better secure the ventilation of every coal mine and
colliery, and provide for the health and safety of the
men employed therein, otherwise and in every re-
spect the owner or agent, as the case may be, in charge
of every coal mine and colliery, shall employ a com-
petent and practical inside overseer, to be called 'min-
ing boss,' who shall keep a careful watch over the ven-
tilating apparatus, over the airways, the traveling
ways, the pump, the sumps, and the timbering; to
see, as the miners advance in their excavations, that

all loose coal, slate or rock overhead is carefully se-
cured against falling; . . . and all things con-
nected with and appertaining to the safety of the men
at work in the mine."

By section 19 of this act it is provided "that any
miner having charge of a working place in any coal
mine or colliery who shall neglect or refuse to keep the
roof thereof properly propped and timbered, to pre-
vent the falling of coal, slate, or rocks, every such
person or persons shall be deemed guilty of a mis-
demeanor, and upon conviction shall be punished by
imprisonment and fine at the discretion of the court
trying the case." An analysis of this statute will
show the following tripartite obligation: (1) The
mine owner is charged with the duty of employing a
competent and practical inside overseer or mining
boss; (2) the mining boss so employed is charged with
the duty of maintaining a careful watch over the venti-
lation and the timbering, and to see, as the miners ad-
vance in their excavations, that all loose coal, slate,
or rock overhead is carefully secured against falling,
etc., and all things connected with or pertaining to
the safety of the men at work in the mines; (3) the
miner having charge of the working place in any mine
is charged with the duty of keeping the roof thereof
properly propped and timbered, to prevent the falling
of coal, slate, or rock. It will thus be observed that
reciprocal duties and obligations are imposed by the
statute upon the company and its employees, which

are equally imperative and binding. It should have been stated that the criminal penalty for a violation of the duties imposed by the statute was denounced against all of the parties named.

It is said, however, that by custom of the company the miner was not charged with the duty of timbering a room neck. It will be observed the statute makes no exception in requiring the miner to prop and timber his working place. It is a question, then, whether the miner could be relieved of this statutory duty by any rule or custom of the company.

In *Mining Co.* v. *Floyd, Adm'r* (Ohio), 38 N. E., 610 (25 L. R. A., 848), the plaintiff's intestate, Clay, a coal miner, engaged in operating a machine that cut the coal, was killed by slate falling from the top of room while so engaged. It appeared that in each room three sets of hands were employed in turn: First, the miners, of whom Clay was one, who operated the machine that cut the coal; next, the drillers, who drilled holes in the face of the coal to prepare it for blasting; and, lastly, the filler, who blasted down and loaded the coal, and who also, by a custom of the mine, was required to post or prop the roof. Clay, while engaged in operating the coal-cutting machine, was killed by slate falling from the top of the room on account of the negligent manner in which it had been previously propped by Dalton, the "filler."

The Ohio statute provided that, "If any miner or other person employed in any mine governed by the

provisions of this act shall neglect or refuse to securely prop or support the roof and entries under his control, he shall be guilty of an offense." The trial judge refused to charge the jury, as requested by the defendant, that, "If they find from the evidence that Clay, when he got killed, was in control of the room, that then, under the criminal statute (section 6871, Rev. St. Ohio), it was his duty to properly post the room, and no custom existing at the time at the mine could relieve him of that duty," and, on the contrary, stated to the jury, in his general charge, that if they found that Clay "violated a criminal statute, for which violation he could have been prosecuted, had he lived, such violation will not preclude a recovery in this action." It was held on appeal that this action of the trial judge was error, and a new trial was granted. In discussing this question, the court said: "So extensive is this industry in the State, that legislation affecting those engaged in it as a daily vocation may be regarded as of public interest; and where a statute, as does the one cited, undertakes to outline and prescribe a particular duty owing by persons so engaged, not only to themselves but to others, it may be properly regarded, as indicating a public policy on the subject, and, where the same provision has remained in force for so long a time,—about twenty years at the time of this occurrence,—the policy may be treated as a settled one. This provision clearly points out a duty devolving upon all who come with-

in its terms, a grave duty; one so nearly related to
the protection of life and limb that it ought not to be
lightly esteemed, nor easily avoided. . . . .

"The object of the statute is to encourage careful-
ness,—regard not only for the life of the miner, but
for the lives of all who may be subject to like risks.
It imposes an obligation to perform a duty to others.
Anything, therefore, which tends to operate in opposi-
tion to that obligation, would violate the policy of
this statute; and hence whatever right the custom at
this mine, imposing upon Dalton the work of prop-
ping and posting the roof of the room, may have given
Clay to call upon Dalton to do the manual work of
posting, and delay his own work until that had been
properly done, such custom ought not to have the ef-
fect to exonerate Clay from the duty enjoined by the
statute, nor shift the risk undertaken by himself over
upon the company. We think the trial judge erred in
refusing to give the instruction requested, and in the
charge as given on the subject."

But without deciding this question, and conceding
that under the rules of the company, as well as by
custom, no obligation rested upon Wallace, the de-
ceased miner, to prop and timber a room neck, as
contradistinguished from a room, which it is admitted
he was obliged to prop, was Wallace guilty of such
contributory negligence as defeats this action? It is
difficult to see wherein the mining boss, Card, was
negligent. He had examined the top a day or two

prior to the accident, and shortly thereafter sent Guess, the timberman, to timber this rock.

It is said, however, that Card, the mining boss, did not return to inspect the room after Guess had timbered it; but, as is argued, this fact was fully known to Wallace, who did not send for Card or make any complaint.

There is no proof tending to show that Guess had improperly or negligently timbered this rock, but the proof is that he carefully tested, after timbering, in order to ascertain whether it was safe.

It is further shown that, under the rules of the company, Guess was subject to Wallace's orders, and that, upon the development of a dangerous condition in the rock, it was the duty of Wallace to send for Guess and have the neck retimbered. So far as this record discloses, Guess had no notice from Wallace of the necessity for further timbering.

We are of opinion that, after a careful examination of this record, Wallace was guilty of gross contributory negligence, and that his negligence, moreover, was the proximate cause of this accident. The record clearly shows that Wallace worked for ten or fourteen hours under the overhanging rock after Guess had set up the cross-timbers; that he steadily undermined the support beneath the end of the rock, and thus caused its dislodgment and precipitation upon himself. The rules of the company imperatively required the miner, when he discovered the top to be

dangerous, to have it repaired, and in the meanwhile to stay from under it.    But in violation of the rules, deceased assumed the obvious risk, by working under the impending rock, and in failing to have it timbered as required by the rules of the company.

The judgment of the circuit court is therefore reversed, and the demurrer to the evidence sustained, and the suit dismissed.