## COALFIELD COAL CO v. BEN MELLHORN.

Eastern Section. October 31, 1925.

Certiorari denied by Supreme Court, February 12, 1926.

1. **Damages. Damages for personal injuries held not excessive.**
    In an action to recover personal injuries suffered in a mine where the evidence showed that the plaintiff was a man twenty-nine years old, stout, industrious and in good health and that his back was broken, his spine injured and his capacity to earn money was reduced seventy-five per cent, held $2000 was a small sum with which to compensate him under such circumstances and an assignment that the damages was excessive was overruled.

2. **Appeal and error. Appellate court will not weigh the evidence.**
    An assignment of error that the verdict if against the weight of the evidence is not available in the appellate court.

3. **Master and servant. The rule that requires a master to furnish a safe place for the servant to work does not apply to a servant whose duty is to make the working place safe.**

In an action by a miner to recover for personal injuries where the duty of the plaintiff was to care for the run ways of the mine and make them safe for other miners, held that the rule which required a safe place to work necessarily does not apply to those whose duty it is to make such a place safe.

4. **Master and servant. Where servant is inexperienced and does not know of the danger of his working place it is the duty of the master to warn him.**

Persons engaged in dangerous work assume the risks and the presumption is that a grown man applying for such work has a knowledge of the risks. However one engaged in such work without such knowledge and his inexperience being known to his employer, must be informed of the risks.

5. **Master and servant. Evidence. Evidence held not to show assumption of risks.**

In an action by a miner to recover for injuries sustained where the evidence showed that the plaintiff was inexperienced and had never worked at such work before, that he so advised his employer and his foreman and they had never advised him of the dangers of his work, held that under such evidence the rule that one engaged in dangerous work assumes the risks did not apply.

6. **Negligence. Party acting in violation of the statute or ordinance is guilty of contributory negligence that will bar a recovery.**

If the plaintiff is acting in violation of a statute or ordinance at the time the accident occurred and which approximately contributes to his injuries, he is guilty of contributory negligence which will bar a recovery for damages sustained.

7. **Statutes. Sections 3079a155, Shannon's Code construed.**

In an action to recover for damages sustained while riding on a loaded trip in a mine where the evidence showed that plaintiff was riding on the trip for the purpose of helping unload certain equipment that had been loaded on the trip, held that since he had a duty to perform, he came under the exceptions in the statute allowing those to ride "whose duty compells them to do so."

Appeal in Error from Circuit Court, Morgan County; Hon. J. H. S. Morrison, Judge.

Affirmed.

John M. Davis and John A. Jones, of Wartburg, and D. O. Harris, of Harriman, for plaintiff in error.

W. Y. Boswell, of Oakdale, and Morris & Justice, of Wartburg, for defendant in error.

SNODGRASS, J. For convenience the parties will be referred to as they were styled below.

This is an action for damages for personal injuries, sustained in a haulage entry of a coal mine of defendant by the plaintiff, who was a trackage helper, while riding at the time on one of the loaded coal cars being pulled from the mine by an electric motor.

The case presented by the original and amended declaration is for $10,000 as damages, averring that the plaintiff was working

for the defendant as a road man, a laborer for hire, that he was directed to ride the cars loaded from one place to another in the mines of the defendant, and to carry with him his tools to repair and fix the road of the defendant; that he was instructed to take his tools and ride the cars of the defendant in and to a certain place in the mines and on its roadway; that he went in said car or cars as directed, with his tools, and was taken into the mines of the defendant, was driven or carried to a place in said mines, and in and out on this roadway that was too low to permit said car and this defendant to pass through and beyond, and was caught between this car and the entry overhead, and was thereby crushed, bruised and mangled, his back broken, bruised and injured, was caused to suffer great physical pain and mental anguish, and that he had been permanently injured thereby and caused to suffer great financial loss, and had been rendered unfit for manual labor and his usual vocations of life; that the plaintiff was injured without negligence upon his part; that he knew nothing of these conditions in said mine, the same not having been pointed out to him or called to his attention by the defendants, or anyone acting for them, and that the plaintiff was in the discharge of his duty at the time of said injury by the defendant; that the defendant criminally, negligently and unlawfully sent him into the place on this car, and the place was too low to permit the car with him on it to pass, and on account of said low top, which was negligently, carelessly and unlawfully permitted and maintained by the defendant, he was injured as aforesaid. He averred that the defendant so operated its mine carlessly, recklessly and in an unsafe and dangerous condition, in that its entries and other openings were unsafe and dangerous; that this condition was known or ought to have been known by the defendant; that this unsafe and dangerous condition was the prime and proximate cause of plaintiff's injuries, without fault on his part. He further averred that the cross bolts in said mine were allowed to come loose and become in a dangerous condition, and that the roof of the entries and openings where this plaintiff was required to work was too low to allow him to pass from place to place in said mine in safety; that there was a great pool of water along, on and over the tracks on the main entry, which forced him in going from place to place in said mines in the discharge of his duties therein to ride the cars in order to carry on his work under the directions of the defendant; that he was a new and inexperienced man on the job and had no warning of the dangers incident to his work by the defendant or anyone acting for him; that because of these dangerous and unsafe conditions he was injured permanently as aforesaid, without fault or negligence upon his part; that the statutory requirements as

to the operation of the mine were flagrantly violated; that plaintiff was put to work in an unsafe and dangerous place; that the entries and openings in said mine were too low, and the roof improperly supported; that the cross bolts and other timbers used in entries and other openings were allowed to become loose and dangerous; that pools of water were allowed to collect and stood on and over tracks and proper inspection of said mine was not had as required by law, and that it was operated in an illegal manner, in violation of the mining laws of the State of Tennessee; that plaintiff's future earning capacity was practically destroyed; that he was able and earning good wages up to that time, but has been unable to do any work since for a greater part of the time, and but little during the remainder thereof.

To this declaration there was a plea of not guilty, and the cause coming on for trial before the court and jury there was a verdict and judgment for the plaintiff in the sum of $2,000.

At the close of the plaintiff's proof there was a motion for a directed verdict, which was overruled. Again at the close of all the proof the motion for a directed verdict was renewed, and again overruled, and the cause submitted to the jury with the result above announced.

A motion was entered for a new trial, which, upon consideration, was overruled, and the defendant prayed and obtained an appeal to this court, and has assigned errors as follows:

"1. There is no evidence to support the verdict of the jury."

"2. Because the greater weight of the evidence preponderates against the verdict of the jury."

"3. Because the court errored in overruling motion for peremptory instructions, made by the defendant at the close of plaintiff's testimony."

"4. Because the court errored in overruling motion for peremptory instructions to the jury to bring in a verdict in favor of the defendant, made at the close of all the testimony."

"5. The court errored as follows: Mr. Boswell asked the court as follows: I ask you to charge the jury that if they find that the trip from six and one-half side track was necessary in order to carry those switches, thereto a point where they could be loaded upon the cars, from which point they were taken to other portions of the mine, that such would not be a violation of the law. Whereupon the court said in the presence of the jury 'I have already charged that.'"

"6. The verdict of the jury is excessive, and was so excessive as to evidence, passion, prejudice or caprice upon their part."

"7. Defendant was surprised by the testimony of the witness Dr. A. Byrd to the effect that plaintiff's back was broken and the bones of the back lapped one upon the other. This testimony, was not founded upon X-ray proof or either casual examination, and can and will be refuted by skilled and competent doctors and defendant, was unable to refute and meet this evidence at the time."

We think this case must turn upon the question as to whether or not the plaintiff, being ignorant and inexperienced, and not aware of the dangers he was assuming, the defendant was negligent in failing to warn the plaintiff of the dangers he was assuming, and, if so, as to whether or not that negligence was the proximate cause of the injury. Being only twenty-nine years of age at the time of the injury, stout and industrious, and in good health, and having his back broken, or spine injured, suffering as he did, and capacity, for life, to earn money reduced seventy-five per cent, two thousand dollars was a small sum with which to compensate him under the circumstances. The sixth assignment of error, therefore, that the verdict was excessive, is not well fortified, and is overruled. If the plaintiff is entitled to anything, he is entitled to the sum the jury gave him.

The second assignment, that the verdict is against the weight of the evidence, is not available here, and is overruled.

This boy was a helper to the trackman, whose duty it was, as appears from the proof, to care for the track and roof, inspect and remove any dangerous obstructions, and report any loosened cross bolts or overhead supports, and to take down any loosened or dangerous projections. So, if any such imperfections rendered the place unsafe, the duty of making it safe devolved upon the head trackman and his helper. The rule which requires a safe place to work necessarily does not apply to those whose duty it is to make such a place safe. Heald, Receiver, v. Wallace et al., 109 Tenn., 364.

The persons engaged in such work assume such risk, and the presumption would be that a grown man applying for such work has a knowledge of such risks. However, one engaged in such work without such knowledge, his inexperience being known to his employer, must be informed of the risks, and it appears from the proof in this case that defendant was informed that this was an inexperienced man. It also appears that the plaintiff was not informed of the risks he was assuming, and the liability is based upon this negligence.

According to the proof several things may have conspired to diminish the passing space in this haulage way, among which were loosening of the supporting timbers of the roof; sagging projections due to its disintegration, or that of supports; irregularities

in thickness of the coal that formerly filled the spaces, leaving the roof irregular; upward heavings of the track over which the cars passed; all these things requiring inspection and repair for the safety of those to whom the duty was owed, and in this case requiring an examination only insofar as conditions may have conspired to prevent the plaintiff in the time of his employment and character of contact to have become acquainted with the risks he was undergoing, thus charging him with responsibility for his own undoing. Considered in the light in which we must take this evidence, there is abundant proof of the dangerous character of the work. There is proof of the previous inexperience of the plaintiff, and of the utter lack of warning by any of those whose duty it was to inform him of the dangers which they knew he was likely to incur. He told the mine boss who employed him that he had no previous experience in track work in coal mines, but that he would try it, and that if he could not do the work he could put him off.

"Q. Now, Mr. Mellhorn, did he say anything about the roof of that mine, about how even it was, or warn you about the dangers in there? A. I never heard a word said about it."

"Q. Now did Dave Brown when you went out and reported to him and commenced to work under him, did Dave Brown know you never had had any experience in mines like that? A. Yes sir."

"Q. Did you tell him so? A. Yes sir."

"Q. You told him so. Did he warn you that the roof was lower in that mine, and it was dangerous? A. No sir."

"Q. Did he warn you against any dangers of any kind? A. No sir."

"Q. Did he warn you against riding those trips? A. No sir."

"Q. Did he tell you it was unsafe and dangerous to ride those? A. He did not."

"Q. Now what if anything did Dave Brown, your boss and foreman say to you about riding those trips? A. Well, we would flag them down, we would load up our tools and ride wherever we wanted to go."

"Q. Who would flag them down? A. Dave Brown."

"Q. Dave Brown himself? A. Yes."

"Q. And they would stop—he was the foreman? A. No, he was the head trackman."

"Q. Those trips would stop when he would flag them down? A. Yes sir."

"Q. And then you would do what? A. Load up our tools, and get on and ride to our work."

"Q. Did you get on those trips under his instructions? A. Yes sir."

"Q. Did he direct you to do so? A. Yes sir."

"Q. And you went as a result of that? A. Yes sir."

"Q. Did he say anything to you about riding these trips out when you had these switches? A. Yes sir."

"Q. What did he say about that? A. Well, we would load them up, and he said he would take them out there and load the four on a flat and take them to the slopes side."

"Q. On the day that you were hurt, did he tell you to take those switches out there and get the others too? A. Yes sir, we was going out there."

"Q. Was he along with you? A. Yes sir."

"Q. Oh! He was on the trip with you? A. He was on the front motor."

"Q. Was he riding on that same trip? A. Yes sir."

"Q. Now did he say anything to you about its being dangerous for you to ride there on top of that car? A. No sir."

"Q. He ordered you to go out there, and you went? A. Yes sir."

"Q. And he was on the same trip with you? A. Yes sir."

He stated in response to a question from the judge that during the six weeks he had been at work that he had been backwards and forwards over the place where he got hurt; that they had been all over the mines; that it was a large mine, but dark, and the entries about a mile and one-half long.

"Q. Mr. Mellhorn, I will ask you this: Did you know where the high places were, and where the low places were? A. No, I had not been there enough to get acquainted with the mines."

"Q. Had anyone told you where they were? A. No sir."

He stated on cross-examination that he was a track man and it was his business to work anywhere the track needed attention; that it was his duty to go wherever they told him to under Dave Brown, and that as was the custom for men to ride on the empty trip, he rode into the mines in the empty trip every morning, and the men so rode. He was asked:

"Q. How did you ride as you went in? A. On the trip."

"Q. Did you sit up on the side of the car; or get down in the bottom? A. Set up on the side."

"Q. That was the way you rode in? A. Yes sir."

"Q. Now you knew it was a violation of the rules of the company, as well as the State, to ride a loaded trip out—you knew that? A. No sir, I didn't know anything about that; never heard no rules."

"Q. Well, you understood and was instructed by the motorman not to ride the trip out? A. No sir, I was not."

"Q. And you was instructed by the superintendent or the gas boss there not to ride a loaded trip, that it was a violation of the law? A. I was not."

"Q. Was not? A. I was not."

"Q. On the very trip where you was hurt, didn't the motorman—what was his name—what was his name who was pulling the car? A. Charley Tinker."

"Q. Didn't he tell you you must not ride a loaded trip? A. No sir."

"Q. Didn't he tell you it was dangerous to get on there? A. No sir."

"Q. Didn't he tell you or warn you to get off? A. No sir."

"Q. Didn't he warn you not to do it? A. No sir."

"Q. The car was full of coal, wasn't it, rounded up? A. Some was, some of them wasn't."

"Q. The one you was on? A. No sir, it wasn't headed up."

"Q. You got on the end of that car, just like this table was the car, (indicating) and the motor was that chair, (indicating). Now Tinker was in the motor? A. Yes sir."

"Q. Was it a gasoline motor? A. Electricity."

"Q. Electric motor. He was on the motor? A. He was sitting on the motor, and I was sitting on the end of the car right by him."

"Q. Say this table was the car (indicating) and that chair was the motor: You got up on the end of the car, you set up here and put your feet on the motor? A. Yes sir."

"Q. And then doubled over? A. Yes."

"Q. Then you was more than twice your natural thickness above the coal? A. No sir."

"Q. Double up in the chair like you did. A. I was sitting on the coal, my feet on the motor. I was as low as I could get."

"Q. Get up there (indicating) on this table. A. I couldn't get up there."

"Q. Well, turn the chair. Now the chair is the car, and this (table) is the motor: How did you do it? A. I was on the end of the car, just as low as I could get between the cars."

"Q. Why didn't it knock you between the cars? A. It caught me and pulled me back."

"Q. How did it get you? A. It caught me on the neck and drug me back."

"Q. And rolled you back on the coal? A. Yes sir."

The tools and switches they had loaded to take forward to be unloaded, and with other switches to be loaded then thence taken

to the slope, were behind on another loaded car somewhere. He was further asked:

"Q. You were at work in there, why didn't you call for an empty car? A. I didn't have anything to do with it. I was going with the track man."

. . . .. . . .

"Q. How many times did you pass through that entry a day? A. I don't know."

"Q. Well, you went in and you came out? A. . We would go through several times a day sometimes, and sometimes up on other entries."

"Q. . How many times do you say this day, you had passed through the place where you say you were injured? A. I don't know."

"Q. As many as two? Are you willing to say under your oath it was as many as two? A. . Yes.."

Just at what particular place they had worked in the mines and doing what particular thing does not definitely appear. It does appear that somewhere on Entry 6 they had collected a couple of switches, and that on Entry 6½ they had loaded on one of the outward bound loaded coal cars two more of these switches, to be taken forward on this car something like a quarter of a mile to the place of the other switches in the mine to be unloaded, and then together with the other switches to be loaded on a car and taken to the slope; that these switches were heavy, and in their loading and unloading required the employment of two men; and it seems that at this stage of the work the dinner hour had arrived, and that in this direction of the car. such dinner as was provided was waiting, presumably at the unloading place.

It is proper to state that between the place in 6½ where these switches were loaded to the other side track where they were to be unloaded, there were pools of water, described by the plaintiff as follows:

"Q. How far did you have to take these switches from the point where you loaded them on the coal out this side track? A. I don't know, something like a quarter of a mile, I expect."

"Q. Something like a quarter of a mile. What condition was the track in between the point where you loaded these switches on the car of coal out to the point where you expected to unload them? A. There was a pond of water about knee deep, or waist deep, and the pumps wasn't working good."

"Q. A pond of water? A. Yes sir."

"Q. And it averaged from knee deep to waist deep? A. Yes sir."

"Q. And the pumps wasn't working? A. Yes."

"Q. How far was that pond of water over these tracks? A. A couple of one hundred yards."

"Q. Where did that water come from? A. Through the old works."

"Q. Through the old works: Could that water have been pumped out, if there had been pumps in there? A. Yes sir."

"Q. It wasn't pumped out? A. No sir."

"Q. Was the water on the tracks on the morning you tell about? A. Yes sir."

"Q. Now did you travel over that water on these cars on this occasion that you were injured? A. When he had to take our tools we would; when we didn't we waded."

"Q. And on this occasion were you walking or riding through the water? A. We was riding."

"Q. What were you on? A. On the motor trip."

"Q. Were you on one of the cars? A. Yes sir."

"Q. Riding one of the cars. Now why were you riding this morning? A. I had to stay with the motor to unload these switches, and load them at the entry, and take them to the slope side."

"Q. Did I understand you to say you were taking them out to unload on a side track and get another switch? A. Going from 6½ to 6 and get switches in the entry, and take the two on the trip, and two already out there, and take the four over on what they call the slope side."

"Q. You had two with you, and there was two out at this side track? A. Yes."

"Q. And what were you going to do with the four? A. Going to load them up in the entry and take them over to the slope."

"Q. For what purpose, Mr. Mellhorn? A. To lay them on a piece of new road."

"Q. To lay them on a piece of new road. Now on the slope, how many of those switches did you have to use, Ben? A. Four."

"Q. Four of them. Now did you reach the side track where you were to unload the two that you had on the coal? A. No sir."

"Q. What was the reason? A. I got rolled."

"Q. Got rolled! Now tell the jury here how it was you got rolled. What was it that rolled you? What do you mean by being rolled? A. Well, I was sitting on the car, with my head down, between the cars, setting between the cars, and something clawed me and drug me back. I was lying back in the car when they stopped the motor and came to myself."

"Q. Where were you sitting? A. Setting on the front end of the car."

"Q. Setting on the front end of the car? A. Sorter between the cars."

"Q. Where were your feet? A. I was on the car and my feet was on the motor platform, or whatever they call it."

"Q. Hanging over the end of the car? A. No, I had them up on the motor."

"Q. Now in what position was your body, Mr. Mellhorn? A. I was down like this, just like this." (Indicating.)

"Q. Now, Mr. Mellhorn, was your body down as low as the top of the cars in that position? A. Just about."

"Q. Was you as low as you could get? A. Yes."

"Q. Now in that position you say something struck you. Where did it strike you? A. It struck the back of my neck."

"Q. What was it? A. Well, I cannot say. I suppose it was a cross bar."

.  .  .  .  .  .

"Q. What, in your best judgment, Ben, was it that caught you there? A. Well, I thought it was a cross bar; I couldn't tell."

"Q. If it wasn't a cross bar, what else could it have been? A. It could have been a rock."

"Q. A rock? A. Yes sir."

"Q. What kind of a rock? A. The top."

"Q. The top? Top of what? A. Entry."

"Q. The top of the entry. Now Mr. Mellhorn, which entry were you in? The main entry? A. On the main entry."

"Q. On the main entry, and you were protecting yourself as best you could? A. Yes sir."

"Q. And you were in that position when you got hurt? A. Yes sir."

"Q. How were you injured? A. Broke down my back."

"Q. In what way were you injured in your back? A. A bone slipped in my back."

He stated further that Jim Fagin, the bank foreman, had employed him in there to work under Dave Brown, the head foreman. As to riding the cars, he said that Fagin, the mine boss had told him to get on the lowest place a day or two before the accident happened; and that Brown, his foreman, on one trip had told him to hunt a low place and get on; but that on the trip he got hurt no one had told him, but that "we all got on."

We have quoted liberally from the evidence of the plaintiff, because it is upon this evidence the case must rest, upon the assignment that there is no evidence to support the verdict. We are aware that

the case thus presented is controverted, but upon the assignment that the court erred in not directing a verdict at the close of the plaintiff's proof, and at the close of all the proof, the evidence of the plaintiff must be viewed in its best and uncontroverted light.

We think this evidence thus viewed did furnish sufficient justification for the verdict, and that these assignments must be overruled. It is true that there is a section of the mining law (Shannon's Code, sec. 3079a155) that provides as follows:

> "It shall be unlawful for any person to ride on a loaded trip or cage in any mine, other than those whose duty compels them to do so, and the violation of this section shall be deemed a misdemeanor and upon conviction the person or persons violating this section shall be subjected to a fine of $25 and cost."

If given the absolute construction contended for by the defendant, it would defeat the right of recovery, and the assignments disposed of in that event would have to be sustained; because it has been held that "if the plaintiff is acting in violation of a statute or ordinance at the time the accident occurred, and such approximately contributes to his injuries, he is guilty of contributory negligence." Sou. Ry. Co. v. Vaughn, L. R. A. 1916 E. 1222. And this being a case where proximate contributory negligence bars a recovery, that result would follow inevitably if the plaintiff, who was riding upon a loaded car at the time, was unlawfully there under the circumstances, because knowledge of the law is imputed. But this statute does not prohibit all riding of such cars, and if the load which required the attendance and presence of the plaintiff was lawfully there, we think its presence and objective enabled the plaintiff to classify under the permissive phrase "those whose duty compels them to do so," just as well as might be claimed for the motorman who was in charge of its direction. This statute is rather to be construed in the light of furthering its purpose, and not as an iron clad penal statute designed to prevent all the convenient use of the cars outside of their motor direction. We think the purpose of the statute was to prevent the riding of the cars by those who had no duty to perform in connection with their use, and that it was not intended to hamper their use and to tax the time of their employment by compelling their awaiting the slow and laborious process of the loading helper coming up through a possible mile and a half of the tortious length of the entries, and in doing so to wade through hundreds of yards of water in their dark passages to unload the switches at some point in these entries convenient for their further transfer. We think that the word "compelled" in this instance should be regarded as a relative term, and should be held to mean all those compelled to keep up with the motor in order not to hamper its operation, and at the same time to expeditiously discharge their duties in relation to the unloading

of the same; that they are by the statute allowed to ride upon the cars, even if a proper regard for their health and comfort would not compel their riding to escape wading through the deep water; that if the language of the statute is such that it will not bear this construction, but must be confined to the motorman, if there is or could be such a thing as an estoppel from making a question of legal negligence, it should be applied in this case, viewed in the light in which we must take it.

If the statute means only those can ride whose duty in its direction compels them to be aboard, then it was honored more in the breach than in the observance by the defendant itself. In addition to this it had allowed its mine to become so flooded with water as to make a ride upon the motor car or some such means almost imperative, if wading in water from knee deep to waist deep for long stretches was to be avoided by those whose employment and duty caused them to have to go from one place in the mine to another, and to use such stretches, as was required in this instance.

Plaintiff had received direction, both from the mine boss who employed him and the foreman (Brown) who directed him, to ride upon these cars, and on the day the injury occurred, near dinner time, when the heavy switches had been placed upon a car loaded with coal, which switches were to be unloaded at a distant place in the mine, from the cars which were on their way out with the coal, and had to wend their way through these waters. in getting out, they all found places upon the motor, and of course this was an invitation to the plaintiff to find him a place, and with the tacit assurance that he could safely do so.

With the question of legal negligence out of the way, it was for the jury to say whether the plaintiff was ignorant and inexperienced, and was known by the defendant so to be, and whether or not they were negligent in failing to inform him of the dangers he was incurring; and, notwithstanding the six weeks time he had been on the job, whether or not his experience in these dark passages had been such before the accident as to sufficiently inform him of these dangers, so that riding on the car would have been at his own risk; and as to whether or not while riding upon the car he was guilty of any proximate contributory negligence that would bar his recovery. The jury having determined all these questions in his favor, and there being evidence supporting their conclusions, we cannot overturn them on these grounds.

If the plaintiff had ridden into and out of the mines on empties to the place where they started at the time of the injury without injury to himself, and had not discovered that he could safely ride on a loaded car, even at a low place and in a position as low down as he could get, it was for the jury to say whether with reasonable

diligence under the circumstances he could or should have known of the danger. If he did, or should have known it, then it was negligence upon his part to have incurred the danger, and if that negligence was the proximate cause of his injury, or proximately contributed thereto, then, of course, he could not· recover. But this was a jury question. If, as claimed, he was ignorant and inexperienced, and unaware of the dangers, and known to be so, if he did not know of the too fateful proximity of any place in the roof, or was not aware that an exigency of a sagging portion of the roof or a possible upheaving of the track under water might diminish at any time for a few inches the safety of one passing on a loaded car, then the boss, or whoever was charged with his oversight should have warned him of such danger, and a failure to do so was negligence; and if such negligence was the proximate cause of the injury, then the liability was established, and it would not be a question of assumption of risk, but of the failure to warn an ignorant man of the nature of the work and character of the risks he was assuming. 9 Ency. Digest Tennessee Reports, page 33, quoting Sherman & Redfield on Negligence (5 Ed.), and citing Tennessee Coal, Iron & Railroad Co. v. Jarrett, 111 Tenn., 565; American Lead Pencil Co. v. Davis, 108 Tenn., 251, 66 S. W., 1129.

The fifth assignment of error as to the charge of the court is overruled, because our construction of the statute is in harmony with the request complained of.

The seventh assignment is likewise overruled. Defendant was notified in the declaration that it was claimed that plaintiff's back was broken, and he had ample time to make preparation to dispute this claim before that and the trial. Besides, it also appears that Dr. Byrd's testimony as to the injury to the back was confirmed by an X-ray photograph and affidavit of Dr. Wilson on the motion for a new trial, and it is not at all probable that any refutation could be had upon another trial. The claim that the plaintiff was himself responsible for his injuries resulting in permanent disability the jury has likewise settled, and we think properly.

It results, therefore, that the assignments of error are all overruled, and the judgment of the circuit court is affirmed, with costs against appellants and their security on the appeal bond.

Portrum and Thompson, JJ., concur.